UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                   :

STRUCTURED ASSET SALES, LLC,       :
                                   :

         Plaintiff,            :   **Index No. 1:18-cv-5839 (RJS)**
                                   :

        v.                    :

                                   :   **THIRD AMENDED COMPLAINT**

EDWARD CHRISTOPHER SHEERAN *p/k/a/*  :
ED SHEERAN, SONY/ATV MUSIC      :
PUBLISHING, LLC, ATLANTIC         :
RECORDING CORPORATION *d/b/a*     :
ATLANTIC RECORDS, BDI MUSIC LTD., :
BUCKS MUSIC GROUP LTD., THE    :
ROYALTY NETWORK, INC., DAVID PLATZ :
MUSIC (USA) INC., AMY WADGE, JAKE :
GOSLING, and DOES 1 THROUGH 10,   :
                                   :

         Defendants,          :
-------------------------------------------------------- X

## INTRODUCTION

    1.     This is an action for willful copyright infringement by an owner of the rights to

the #1 international hit song "Let's Get it On," a song written and produced by professional

songwriters Edward Townsend Jr. and Marvin Gaye Jr. in 1973 and registered with the United

States Copyright Office.  Defendant Edward Christopher Sheeran ("Sheeran"), the credited

purported writer of the #1 2014-2015 and present international hit song "Thinking Out Loud,"

along with the other Defendants, copied and exploited, without authorization or credit, the "Let's

Get it On" composition.

    2.     This case is brought by Structured Asset Sales, LLC, ("SAS"), a Limited

Liability Company based in Los Angeles, California, which invests in and owns rights to

thousands of songs and musical compositions and is owned by David Pullman, who is its

Founder, Chairman and CEO, as well as the principal of The Pullman Group, LLC, the creator of

all Pullman Bonds, including the world famous financial landmark $55 million transaction rated single-A level by multiple ratings agencies Pullman Bond for David Bowie, and Pullman Bond series for the Motown Hit Machine, Holland Dozier Holland, R & B Royalty, Ashford & Simpson, The Godfather of Soul, James Brown and The Isley Brothers, among others.  See **www.pullmanbonds.com**.  SAS is a beneficial owner of one-third of all of the copyright rights of Townsend in all of his catalog of works, including "Let's Get it On."

3.      SAS brings this action for Defendants' infringement of the copyright in the composition of "Let's Get it On," and for all damages arising from that infringement, based on 100% of the ownership of that composition, including 100% of the publishers' share and the writers' share of those rights, less any percentage of rights that are adjudicated in the pending action captioned *Griffin v. Sheeran*, No. 1:17-cv-05221 (S.D.N.Y. July 11, 2017) on behalf of the plaintiffs and against the defendants in that case.[1]

4.      "Let's Get it On" was written and produced by Townsend and Gaye in 1973, registered internationally in 1973, and renewed with the United States Copyright Office in 2000.

5.      "Thinking Out Loud" copies various elements of "Let's Get it On," including but not limited to the melody, rhythms, harmonies, drums, bass line, backing chorus, tempo, syncopation and looping.  Plaintiff brings this action for copyright infringement under 17 U.S.C.§101, 501 *et seq.,* arising from the Defendants' unauthorized reproduction, distribution and/or public performance of the infringing composition.

## **JURISDICTION**

6.      The Court has subject matter jurisdiction under 28 U.S.C. § 1338(a) because this

---

[1] Plaintiffs in that case brought their first action against the defendants in that case on August 9, 2016.  *Griffin v. Sheeran*, No. 1:16-cv-06309.  For purposes of calculating the statute of limitations, the claims in the present case relate back to no later than that initial filing date.

action arises under the Copyright Act of 1976, 17 U.S.C. § 101, *et. seq.* Federal Courts have exclusive jurisdiction over such claims pursuant to 28 U.S.C. § 1331.

7.      This Court has personal jurisdiction over the enumerated Defendants because they have directed their activities and marketing of the infringing work to New York residents, and New York residents are able to purchase, download, and stream the infringing compositions and recordings.

8.      Defendants have engaged in systematic and continuous business activities relating to the infringing work. As such, the Defendants have engaged in continuing business activities in the instant jurisdiction.

9.      The instant Defendants are, at a minimum, constructively aware of their continuous and substantial commercial interactions with New York residents.

10.     Defendant Sheeran has performed, and he and the other Defendants have authorized, organized, and promoted performances of the infringing work numerous times in New York.

11.     The Defendants have generated touring and recording revenues from the unauthorized and unlawful exploitation of the infringing work, including receiving substantial revenue from such exploitation in New York. They have advertised the infringing work to New York residents.

12.     The Defendants, individually and collectively, have generated substantial revenue from the exploitation of the infringing work in New York.

13.     New York has a considerable interest in adjudicating disputes wherein New York residents are the target of the harm resulting from exploitation of the infringing work.

14.     Sheeran is a resident and has spent substantial time, including time spent while

engaged in copyright infringement, in Los Angeles, California, while working on the album which included "Thinking Out Loud."

15.     Venue is proper in this Judicial District pursuant to 28 U.S.C §1391(b), §1391(c), and §1400(a), respectively, because the corporate Defendants maintain offices in and are subject to personal jurisdiction in this Judicial District and have committed unlawful acts of infringement in this Judicial District.

## PARTIES

16.     The Plaintiff in this case is a limited liability company owned by its founder, chairman and CEO David Pullman, based in Los Angeles.  It is the owner of one third of the estate assets of Mr. Townsend Jr. Mr. Townsend Jr. died intestate in 2003 and his estate was divided one third to each of his children. One of his children, Clef Michael Townsend, sold his entire share and right in the estate to SAS. That interest was put up for sale by Clef Michael Townsend, and the sale was approved by the probate court in California. Mr. Ed Townsend Jr. was the co-writer of the lyrics of "Let's Get It On" and creator of its musical composition. Plaintiff, with the other heirs of Mr. Townsend Jr., are engaged, among other things, in conducting the business of music publishing and otherwise commercially exploiting the musical composition copyrights of the music of Mr. Townsend Jr. They are either the legal owner of the copyrights or the beneficial owner of the copyright since they share in the proceeds of exploitation of the copyright.

17.     Upon reasonable information and belief, Defendant Edward Sheeran is a musician, singer, songwriter, and producer living in the United Kingdom who does business in New York, individually, and under his company, Gingerbread Man Records. Sheeran was nominated for a Grammy Award for Best Record, Best Performance, and Song of the Year in

2016 for "Thinking Out Loud." He has numerous other awards such as British artist of the year in 2015, Album of the Year in 2015 from BRIT Awards, and Best Male Artist in 2016 from People's Choice Award. Sheeran conducts systematic and continuous business in New York including, but not limited to, public performances, and selling albums and merchandise to the citizens of New York. The Defendant, Edward Sheeran has reproduced, distributed, and publicly performed the infringing work and sound recording and/or authorized its reproduction, distribution and public performance.

18.     Upon reasonable information and belief, SONY/ATV Music Publishing, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.  Upon reasonable information and belief, Sony/ATV is the music publisher for "Thinking Out Loud" and administers "Let's Get It on" with EMI Music Publishing, both of which are run by CEO and Chairman Martin "Marty" Bandier. EMI Music Publishing is owned by a consortium of companies led by Sony/ATV.  Sony/ATV has generated substantial revenue from the exploitation of the infringing work. It is in a unique position to have known about and/or participated in the exploitation of either or both works. Its conflicting position made it impossible for it correct the problem.

19.     Upon reasonable information and belief, Atlantic Recording Company d/b/a Atlantic Records is a Delaware corporation with its principal place of business in New York.  Atlantic Records is owned by Warner Music Group Corporation, which also has its principal place of business in New York.  Atlantic Records is responsible for the production, manufacture, distribution, marketing, sale and promotion of "Thinking Out Loud" in the United States.

20.     Upon reasonable information and belief, BDi Music Ltd. ("BDi") is a music

publishing company organized under the laws of the United Kingdom, and whose songwriters include Defendant Amy Wadge ("Wadge"), the co-writer of "Thinking Out Loud."  According to the BDi website, "BDi is administered by Bucks Music Group on a Worldwide basis."  Upon reasonable information and belief, BDi is responsible for the publishing of Wadge's share of "Thinking Out Loud" in the United States.  According to the ASCAP ACE database, the point of contact for BDi in the United States is The Royalty Network, in New York.  According to Defendants' counsel, BDi is the copyright owner of "Thinking Out Loud," and BDi has a worldwide administration agreement with Defendant Bucks Music Group Ltd. ("Bucks").

21.     Upon reasonable information and belief, Bucks Music Group Ltd. is a music publishing company organized under the laws of the United Kingdom, and which is responsible, on behalf of BDi, for the administration and publishing of Wadge's share of "Thinking Out Loud" in the United States.  According to the Bucks website, Bucks has an office in New York. According to Defendants' counsel, Bucks has a subpublishing agreement with Defendant DPMI, through which DPMI has the right to administer "Thinking out Loud" in the United States.

22.     Upon reasonable information and belief, The Royalty Network, Inc. ("TRNI") is a corporation organized under the laws of the State of New York, with offices located at 224 W 30th St., Room 1007, New York, New York 10001-1077.  According to the ASCAP ACE Database, TRNI is the point of contact for BDi in the United States.  The TRNI website indicates that Bucks Music Group is among its catalogs, and that "Thinking Out Loud" is among the works for which it has the authority to grant licenses.  According to Defendants' counsel, DPMI has contracted with TRNI to administer certain songs, including "Thinking Out Loud," in the United States.

23.     Upon reasonable information and belief, David Platz Music (USA) Inc. is a

corporation organized under the laws of the State of New York, with offices located at 224 W

30th St., Room 1007, New York, New York 10001-1077.  According to Defendants' counsel,

DPMI has contracted with TRNI to administer certain songs, including "Thinking Out Loud," in

the United States.

24.     Amy Wadge is the co-writer (with Sheeran) of "Thinking Out Loud."  Upon

reasonable information and belief, Wadge is a citizen of the United Kingdom.  Upon further

reasonable information and belief, Wadge collects, and directs others to collect for her, millions

of dollars each year generated from musical compositions and recordings in the United States to

which she holds rights, including "Thinking Out Loud."  Upon further reasonable information

and belief, Wadge is a member of PRS For Music ("PRS"), the UK-based performing rights

society, and has registered her musical compositions, including "Thinking Out Loud" with PRS.

Upon further reasonable information and belief, Wadge has affirmatively selected the American

Society of Composers and Authors ("ASCAP") to collect revenues on her behalf in the United

States that are generated from the musical compositions to which she holds rights, including

"Thinking Out Loud," and ASCAP does in fact collect millions of dollars on behalf of Wadge

every year.  Upon further reasonable information and belief, Wadge has affirmatively selected

Soundexchange, Inc. ("Soundexchange") to collect revenues on her behalf in the United States

that are generated from musical recordings to which she holds rights, including "Thinking Out

Loud," and Soundexchange does in fact collect millions of dollars on behalf of Wadge every

year.  Upon further information and belief, Wadge has entered into, and continues to enter into

on a regular and persistent basis, contracts and other sophisticated and high-value business

arrangements with individuals and entities in the United States in general, and this District in

particular.

25.     Jake Gosling is the producer of "Thinking Out Loud."  Upon reasonable information and belief, Gosling is a citizen of the United Kingdom.  Upon further reasonable information and belief, Gosling collects, and directs others to collect for him, millions of dollars each year generated from musical compositions and recordings in the United States to which he holds rights, including "Thinking Out Loud."  Upon further reasonable information and belief, Gosling has affirmatively selected Soundexchange to collect revenues on his behalf in the United States that are generated from musical recordings to which he holds rights, including "Thinking Out Loud," and Soundexchange does in fact collect millions of dollars on behalf of Gosling every year.  Upon further information and belief, Gosling has entered into, and continues to enter into on a regular and persistent basis, contracts and other sophisticated and high-value business arrangements with individuals and entities in the United States in general, and this District in particular.

26.     Plaintiff is ignorant of the true names and capacities, whether individual, corporate, associate or otherwise, of defendants DOES 1 through 10, inclusive.  Plaintiff is informed, believes and thereon alleges that each fictitious defendant was in some way responsible for, participated in, contributed to the matters and things of which Plaintiff complains herein, including but not necessarily limited to the creation, recording, distribution or administration of "Thinking Out Loud," and in some fashion has legal responsibility therefore. When the exact nature and identity of such fictitious defendants' responsibility for, participation in, and contribution to the matters and things herein alleged is ascertained by Plaintiff, Plaintiff will seek to amend this Complaint and all proceedings herein to set forth the same.

## FACTS

27.     The musical composition, "Let's Get It On", (the "Work") was written by Marvin

Gaye Jr. ("Gaye") [the copyright registration lists only Townsend as the author] and Edward

Townsend Jr. ("Townsend").  The composition was registered for copyright in 1973 and

copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063. A

recording of the song was later made by Gaye, in 1973.  As a co-author of the Work, Mr. Edward

Townsend Jr. co-owned the copyright and shared in the proceeds of the exploitation of the work,

through record sales, public performance, synchronization and other uses of the Work.  Plaintiff

SAS is one of the co-owners of the copyright in the Work through its purchase of all the rights

from Clef Michael Townsend, one of the three children of Edward Townsend Jr., approved by

California probate court.

28.    The harmonic, melodic, and rhythmic elements of composition in "Let's Get It

On" have made this song one of the most famous songs in R&B and soul and popular music

history. "Let's Get It On" has been anthologized by celebrated music producers and ranked as

one of the top greatest breakbeats of all time. It has been covered by a number other musical

performers.

29.    Defendant, Edward Sheeran, professionally known as "Ed Sheeran", is a musical

artist.  Mr. Sheeran experienced a sharp and sudden rise as an international music star in less

than eighteen (18) months as a direct result of the commercial success of the release of

"Thinking Out Loud", the lead single in the United States from Sheeran's debut album, "X", of

which "Thinking Out Loud" was the hit.

30.    "Thinking Out Loud" infringes "Let's Get It On."  This case seeks damages for

Defendants' willful copyright infringement.

**Comparison of the Two Songs**

31.     "Let's Get It On" begins with an iconic melody, harmony and rhythm that are recognized around the world.  The prominence of the bass line and drum composition throughout the Work make these compositional elements qualitatively unique, copyrightable and important to the musical work as a whole.  The combination of these elements is the driving force of this composition.

32.     The two songs share a distinctive combination of musical materials, designated as the backing pattern; it is comprised of a coordination of harmony (chord progression), bass line, and rhythm. The backing pattern as it occurs in these two recordings refers to a combination of music played by the drums, bass, and guitar and/or keyboards. This combination of instruments functions as the accompaniment to the vocal line, which is essentially present to support the vocal line.  This shared backing pattern can be heard at 0:00-0:07 in the Gaye recording and at 0:00-0:06 of the Sheeran recording. After its initial appearance in each song, this pattern is repeated many times during both songs, becoming a major element in each song, forming a distinctive accompaniment to the vocals in each case.


**Comparison of Chord Progression**

33.     The distinctiveness of this backing pattern arises in part from the harmony, or "chord progression" that it articulates. In music theoretical terms, we hear the "tonic" chord (designated as "I") with first scale degree in the bass, followed by a chord with the third scale degree in the bass, then the "subdominant" chord (or "IV") with the fourth scale degree in the bass, and finally the "dominant" chord (or "V") with the fifth scale degree in the bass.

34.     Marvin Gaye's "Let's Get It On" is based on a chord progression formed by the

chords E-flat, G minor, A-flat, and B-flat. Musicians commonly assign roman-numeral labels to chords in order to specify their harmonic function, and these numerals are based on the position of each chord with regard to the scale in use. The chord build on the first note of the scale—a C note in C major, for instance—will be labeled "I." In a similar manner, those based on the second, third, fourth, fifth, six, and seventh notes will be labeled 'ii," "iii," "IV," "V," "vi," and "vii⁰" respectively (note that upper-case numerals are used for major chords and lower-case numerals for minor chords). This system of labeling is so common that there is almost no student who studies music in North America who does not learn these numerals at some point in his/her training.

35.     The term "scale degree" is commonly used to designate a particular note's place within a particular scale. For example, using a simple C-major scale (C, D, E, F, G, A, B, C), we would refer to the first note in the scale, C, as "scale-degree one" or "first scale degree"— meaning simply that it is the first note in that scale. It thus follows that D would be referred to as "second scale degree" and E as "third scale degree," etc. The usefulness of the "scale degree" designation is that it allows musicians to discuss the properties of these notes in a way that is transferable across all keys, making comparisons between songs and musical passages much more effective.

36.     Using this system, the chord progression employed in the backing pattern of Gaye's song may be written as I – iii – IV – V (see example 1a). Sheeran makes a slight adjustment to this chord pattern in his song: the I, IV, and V chords are maintained from Gaye's song, but the iii is replaced with a common substitute. As any freshman harmony textbook will attest, the I chord with the third scale degree in the bass may stand in (or substitute) for the iii chord without affecting the function of the progression (the bass lines in each recording are

discussed in more detail immediately below). Sheeran uses this chord, commonly labeled "$I^6$," as a slight modification of Gaye's original (see example 1b), producing a mild and harmonically equivalent variant: $I – I^6 – IV – V$.



*Examples 1a (Gaye) and 1b (Sheeran): chord progressions compared*

37.    In Gaye's song, this chord progression within the backing pattern occurs in the key of E-flat, and in Sheeran's song the progression occurs in D major. But because of the power of the roman numerals (and scale degrees) to capture the relationship between the chords in each case, listeners will hear the two progressions as functionally equivalent. Thus, the strong and marked similarity between the use of this progression in Gaye's and Sheeran's songs is barely affected by the different keys used. That different keys do not affect the identity of a song is borne out by the fact that singers often change the keys of songs to suit their voices. In fact, the value to musicians of thinking about chord progressions in the manner described here is that they make it easy to "transpose" (or change the key of) any given song quickly. Such transposition is considered a basic skill for professional musicians. Many listeners will not recognize that Frank Sinatra sang "My Way" in D major, while Elvis Presley sang that song in C major; it is clearly the same song despite the difference in key. The difference in key between those two versions of "My Way," is slightly greater than the difference between the Gaye and Sheeran songs considered here. Without a direct A-B comparison of the two, virtually no listener (except the very few who possess perfect pitch – less than a fraction of 1% of the population) would be able to hear the difference in key between the two songs. In fact, a vinyl recording of Sheeran running

a little fast and one of Gaye running a little slow would meet in the middleground separating the two, making them identical. In short, the backing patterns of the songs use equivalent progressions, with Sheeran's introducing only one minor variation on Gaye's (see example 1a and 1b for comparison). While the shared chord progression may not be enough, in isolation, to support a claim of copyright infringement, the situation changes in an important way when the bass line is added to our consideration.

**Bass Line Comparison**

38.     An important part of why the chord progression sounds the way it does has to do with the notes that comprise the bass line in each song. In Gaye's song, the bass plays an E- flat to accompany the I chord, and then a G to accompany the iii chord. The bass then employs an A-flat to support the IV chord, and a B-flat to support the V chord. This combination creates a bass line that goes: E-flat – G – A-flat – B-flat (see example 2a). This sequence of notes in the bass is understood by musicians as the scale-degree pattern 1 – 3 – 4 – 5. Thinking of the bass pattern as 1 – 3 – 4 – 5 (instead of as specific notes) thus creates the relationship between the notes in a manner substantially similar to that of the I – iii – IV – V pattern mentioned above. Sheeran's "Thinking Out Loud" employs the bass notes D – F sharp – G – A to accompany its I – I$^6$ – IV – V chord progression (see example 2b). While these specific four notes are seemingly different from those used by in Gaye's song, this difference is entirely due to the difference in key; the relationship between scale-degrees 1 – 3 – 4 – 5 remain unaffected by the change of key from E-flat to D: the two bass lines are equivalent.



*Examples 2a (Gaye) and 2b (Sheeran): bass lines compared*

39.     When we think of Sheeran's song in terms of the roman numerals as we did with Gaye's song, the strong substantial similarity between the two songs is further revealed. Sheeran's song employs the identical chord-bass pairing as Gaye's song does: I – I[6] – IV – V. The importance of this specific combination of elements is even more strongly reinforced when we consider the rhythm of this chord-bass pair.

**Comparison of Harmonic Rhythm**

40.     There are many ways that musicians think and speak about rhythm. In order to examine the role rhythm plays in the similarity between these two songs, we will turn to a consideration of "harmonic rhythm." The term harmonic rhythm refers to the timing of the chord changes in a song. Gaye's "Let's Get It On" sets the I – iii – IV – V chord-bass progression to a distinctive rhythm as shown in example 3a. This rhythm extends over two measures (or bars) according to a 4/4 time signature, dividing the duration of the first two chord-bass pairings unevenly, as represented by the dotted quarter and eight note tied to a half note. The third and fourth chord-bass pairings divide the second measure in a parallel manner to the first measure.

41.     There is a marked chord progression in "Let's Get it On" that is distinctive. In addition the bass line in "Let's Get it On" is marked and the rhythm is unique. The Ed Sheeran version in "Thinking Out Loud" uses a substantially similar chord progression. In addition, the

bass line used is substantially similar to the bass line in "Let's Get it On," even if a different key is used.

42.     The combination of the shared chord progression, the shared bass line and shared harmonic rhythm confirm the fact that "Thinking Out Loud" infringes on the Copyright of "Let's Get it On."





43.     Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in

Gaye's "Let's Get It On," and this is shown in example 3b. Played in an A-B comparison, 3a and 3b make the strong similarity between the two songs abundantly clear. It does not require an understanding of standard rhythmic notation to see (and hear) that this rhythm is identical between the two songs.

44.     In comparing the melodic vocal pitches for the first two phrases of each of the songs each example is based on a repeated chord progression, supporting variations in the vocal parts.  Although the verse of each song is built upon four hearings of the same progression, the first two phrases (essentially repeated, with ornamental variation, for phrases three and four) are sufficient for comparison purposes.

a. Marvin Gaye, "Let's Get It On," first two phrases of verse:

**I - iii** 3-4-5-4-3- | **IV** b3-4-b3-4-b3-1- **V** 2; | **I - iii** b3-2-b3-b3-2 | **IV** 2-1-6 | **V** b3-2-1

b. Ed Sheeran, "Thinking Out Loud," first two phrases of verse:

**I - I⁶** 3-4-5-4-3-2-1- | **IV** 2-3-6-1 **V**; **I - I⁶** 3-4-5-4-3-2-1- 1 | **IV - V**

45.     The striking similarity of the harmony, bass line and rhythm backing patterns of both songs, along with the use of the backing pattern as a repeated element on which each song is constructed, demonstrate that Sheeran's "Thinking Out Loud" is based on Marvin Gaye and Ed Townsend's "Let's Get It On."

46.     Holding aside rhythmic similarities for the moment, the two melodies exhibit many identical elements with pitch alone, all accented in relation to their ornamental differences.

**Comparison of Use of Backing Patterns**

47.     Having identified the similarity between the backing pattern in the Gaye and Sheeran songs, we will now demonstrate how often this pattern occurs in each recording. As

Example 4a shows, Gaye's song begins with a verse-chorus pair (0:00-0:48), following by a pair of verses (0:48-1:34).  All of this music is based on the backing pattern, which occurs 16 times during these sections. Since the backing pattern is two measures in length, this means that the first 32 measures of the song all feature the backing pattern. Looking at the rest of the song, we can see that there are, in fact, only two places in the song where the backing pattern is not present, and that is in portions of the bridge, which occurs twice overall on the recording. Adding up all of the measures of the song, it turns out that there are a total of 104 measures, of which 84 measures employ the backing pattern. This means that approximately 80% of the song features the backing track.

48.     Example 4b shows the structure of Sheeran's "Thinking Out Loud." The example shows that the backing track is present in 64 of the song's 90 measures, meaning that it is present during about 71% of the song. It is fair to conclude from this comparison that the backing pattern forms the basis of both songs, and that this backing pattern plays the same role in the Sheeran song as it does in the Gaye song.

*Example 4a (Gaye): The overall musical form of "Let's Get It On," indicating the number times the backing pattern appears and showing the percentage of measures that it is present*

| Timing | Section | Description |
|---|---|---|
| 0:00-0:25 | verse | 8 mm., uses backing pattern (4)*, two beat pick-up |
| 0:25-0:48 | chorus | 8 mm., uses backing pattern (4) |
| 0:48-1:12 | verse | 8 mm., uses backing pattern (4) |
| 1:12-1:34 | verse | 8 mm., uses backing pattern (4) |
| 1:34-2:20 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 2:20-2:43 | chorus | 8 mm., uses backing pattern (4) |
| 2:43-3:06 | chorus | 8 mm., uses backing pattern (4) |
| 3:06-3:51 | bridge | 16 mm., mixes backing pattern (3) in with new material |
| 3:51-4:14 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 4:14-4:37 | chorus | 8 mm., uses backing pattern (4), free vocal improv |
| 4:37-4:50 | chorus | 8 mm. to fade out, uses backing pattern (4), free vocal improv |

Total number of measures in song = 104
Total number of measures that employ backing pattern = 84 (80.7%)

*The numeral 4 in parenthesis indicates that the backing pattern appears 4 times. Because the backing pattern in two measures in length, four statements of this backing pattern will be eight measures in length.

> *Example 4b (Sheeran): The overall musical form of "Thinking Out Loud," indicating the number times the backing pattern appears and showing the percentage of measures that it is present*
>
> 0:00-0:24    A – verse      8 mm., uses backing pattern (4)*
> 0:24-0:49    A' – verse     8 mm., new melody, uses backing pattern (4)
> 0:49-1:13    B – bridge     8 mm., new chord progression, new melody
> 1:13-1:43    A'' – verse    10 mm., new melody, uses backing pattern (4) except for last two measures
>
> 1:43-2:08    A – verse      8 mm., uses backing pattern (4)
> 2:08-2:49    A' – verse     8 mm., new melody, uses backing pattern (4)
> 2:49-2:56    B – bridge     8 mm., new chord progression, new melody
> 2:56-3:27    A'' – verse    10 mm., new melody, uses backing pattern (4) except for last two measures
>
> 3:27-3:51    A – verse      8 mm., guitar solo, uses backing pattern (4)
> 3:51-4:21    A'' – verse    10 mm., new melody, uses backing pattern (4) except for last two measures
> 4:21-4:35    Ending (tag)   4 mm., repeats last two bars of A'' two times
>
> Total number of measures in song = 90
> Total number of measures that employ backing pattern = 64 (71.1%)

**Comparison of Vocal Melodies**

49.    A comparison of the vocal melodies in these two songs shows that there are melodic passages in Sheeran's song that are substantially similar to passages in Gaye's recording. This can be seen most clearly by comparing the first four measures of "Thinking Out Loud" with the second four measures of Gaye's eight-bar chorus for "Let's Get It On." This comparison is shown in examples 5a and 5b (note that timings are given for the Gaye example to make it easier to locate the place in the song example 5a refers to). Since the two songs are in different keys, the best way to compare the melodies is by using scale-degree numbers; identical numbers shared by notes in different songs means that such notes would be the same if both songs were in the same key.

50.     Both melodies begin on the same chord tone, ascend and then fall in exactly the same manner. Both melodies are delayed until a second chord appears. They both descend stepwise in exactly the same way.  In both songs, verses are composed of couplets formed of a repeated line. In both songs, the repeated line itself contains a repeated progression. Each verse, then, in both songs, contains one progression heard four times, supporting a longer line performed twice. In both songs, the chorus is also in the identical pattern.  In both songs, contrasting sections lead to stop-time solo singing over climactic chords.

51.     There are further similarities in rhythm in the two songs.  They both have four beats per measure. Syncopation, which is the accentuation of a beat that occupies a normally weak metric position (such as the backbeat or offbeat), is also a telltale marker that unites the two songs in unusual ways. Chords typically change every two beats or every four beats, providing a "harmonic accent" on strong downbeats (the first beat of every four) or third beats. Syncopated chord changes, occurring on weak beats or weak parts of beats, are much less common, but these are heard in both songs.

52.     Melodies are marked by which vocal pitches are metrically accented in relation to others, which appear directly with the chord changes (the strongest accent, especially when aligning with first beats of measures) and which appear in weaker metric locations. Both Gaye's and Sheeran's vocal melodies begin in metrically weak positions, delaying the singing until the second chord appears. Whereas in most songs, verses maintain the same or similar rhythms one after the other, both Gaye and Sheeran provide a great deal of extemporaneous rhythmic abandon in verses that appear after the first, especially ending phrases in different places (on beat 3, on the second half of beat 3, on beat 2, etc.), thus both expressing the same degree of rhythmic freedom on the musical surface.

53.    In the first measure of the Gaye example (5a), two sequences of scale-degrees are highlighted by underlining and enclosure within asterisks. The first of these is the scale-degree sequence 6 5 3 2, and the second is the scale-degree sequence 3 5 6 5 3. Note that both of these sequences occur mostly over the first measure of the two-measure backing pattern.

54.    Example 5b shows the first four bars of Sheeran's "Thinking Out Loud." Note that the scale-degree sequences 6 5 3 2 and 3 5 6 5 3 found in "Let's Get It On" both appear in Sheeran's vocal melody, and also mostly in the first measure of the two-measure backing pattern.



**Comparison of Tempos**

55.    It should be noted that the tempos of the two songs are virtually identical: Gaye's song clocks in at about 83 beats per minute, while Sheeran's sets a slightly slower pace of about 79 beats per minute. This is a very small difference, especially considering that the two songs are in the same time signature of 4/4. In fact, within this tempo range any particular live performance

21

of either song could vary by 4 beats per minute, thus erasing any difference, no matter how slight. Similarly to the remarks earlier in this study concerning the differences in key, most listeners could not detect the difference in tempo between the two songs if the songs were not placed in an A-B comparison with one another. In fact, certain performances in what the listener takes to be a steady tempo can actually include a slight increase (and less often decrease) in tempo over the course of the song without most listeners being aware of it. It is thus best to think of tempo in terms of a "range of similarity" in which tempos that are within approximately 5% of one another can be considered equivalent (not unlike the way the "margin of error" functions in polling). Thought of in this way, the slower end of the tempo range for the Gaye song overlaps the faster end of the tempo range for the Sheeran one: the two tempos are equivalent.

56.     Songs with four beats per measure (the same meter as in Gaye and Sheeran) that include the I – iii – IV – V progression class range from a slow 72 beats per minute to a fast 160 bpm. Both Gaye and Sheeran recordings proceed at the same, at 80 bpm (± 2 bpm, as they both fluctuate slightly). No other identified song in history prior to "Let's Get it On" includes a I – iii – IV – V or I - $I^6$ – IV – V progression and the same tempo.

57.     In songs that include the I - iii - IV - V progression class, chords typically change every two beats or every four beats, providing a "harmonic accent" on strong downbeats (the first beat of every four) or third beats. Syncopated chord changes, occurring on weak beats or weak parts of beats, are much less common, but these are heard in both Gaye and Sheeran songs. All other known such examples of syncopated changes within the I - iii - IV - V progression class, have a tempo much faster than Gaye's and Sheeran's 80 bpm.

58.     The Gaye and Sheeran songs are two of only four songs identified in history with the I – iii – IV – V chord progression class that share the same pattern of syncopated chord

changes, as well as being the only two such examples with that progression class to move at the tempo of 80 bpm.

**Lack of Any "Prior Art" to "Let's Get it On"**

59.     In addition to the foregoing musical similarities between the two songs, both songs share a set of common elements that do not occur in combination in any other song:

a.  Both songs are based on the same chord progression class (I - iii - IV - V), indeed mostly on exactly the same progression, I - I$^6$ - IV - V.

b.  Both songs use this progression as a loop in both verse and chorus passages.

c.  Both upper-voice melodies are based on the shape, ^3 - ^4 - ^5 - ^4 - ^3 - ^2 - ^1, which then moves to scale degrees ^6, ^1 and ^2, with identical accents.

d.   Both songs emphasize as scale degrees upper-voice ^5 and ^3 over the iii chord, as opposed to the more usual ^7 over iii.

e.   Both songs end cadential phrases on a non-resolving upper-voice ^1, even though this is not a member of the goal V chord. In both cases, the lack of tension resolution is related to the song's underlying theme.

f.  Both songs share the same formal structure at sub-phrase, phrase, section, and multi-section levels.

g.   Both songs have the identical tempo of 80 beats per minute (+2 bpm, as above), uniquely for the chord progression.

h.  Both songs share the same identical syncopated rhythm of chord changes.

i.  Both songs' vocal melodies begin in the same markedly weak metrical location, and in both, the vocal goal of ^5 is achieved at the same metrical

position within the phrase.

j.   Both songs have a similar distribution of vocal melismas, expressing in both a
     similar theme.

60.   Defendants' access to Plaintiff's work is beyond challenge, as "Let's Get it On" is
a world-famous composition and recording, and the two works are indeed substantially similar
for purposes of copyright infringement.  The additional fact that no other song shares the
foregoing characteristics is strong evidence not of arbitrary convergence or parallel development,
but knowing, willful infringement.

61.   Indeed, upon information and belief Sheeran himself regularly performs both
songs together in a "mash-up" format, moving from one song to the other and back again.  At
least one example of one such performance is publicly-available on YouTube
(https://www.youtube.com/watch?v=RxZjVZKVN7k) (see time index 4:29-5:10).  Sheeran
transitioned seamlessly between the lyrics of the two songs without changing the notes, tempo,
rhythm or any other elements.

62.   Upon reasonable information and belief, "Thinking Out Loud" has hit the number
one (1) position on the national charts in eleven (11) countries since 2014, including both the
United States and the United Kingdom, and has been certified platinum multiple times by the
Recording Industry Association of America, indicating sales in excess of one million (1,000,000)
copies sold in the United States, as well as substantial sales internationally. The single and the
album "X" sold over fifteen (15) million copies. In 2015, "Thinking Out Loud" was a top-three
song as measured by performance income in the world. Revenue derived and/or related to
"Thinking Out Loud," including but not limited to record sales, performance tour income,
merchandising, synchronization and licensing are in the hundreds of millions of dollars.

63.     According to the Official Charts Company, the recording of "Thinking Out Loud" is one (1) of the best-selling singles of all time in the U.K., having sold over 2 million (2,000,000) copies and ten (10) million albums. Upon reasonable information and belief, the Defendants have authorized the use of "Thinking Out Loud" in compilation albums, television commercials and music videos. Specifically, the music video for "Thinking Out Loud" is one of the most popular sponsored music videos on YouTube.  Prior to the viewing of "Thinking Out Loud" on YouTube, an advertisement appears for which the Defendants are entitled to and receive a royalty or other revenue, which is Plaintiff's money. As of June 2018, "Thinking Out Loud" has been played over **one billion times** on YouTube and streamed **billions** of times.

64.     The Defendant, Mr. Edward Sheeran, has had access to "Let's Get It On" by virtue of its wide dissemination. In fact, he has referenced and performed the song while also performing "Thinking Out Loud".  In addition, the Defendant, Edward Sheeran, by and through the Defendant, Sony/ATV, had increased access to "Let 's Get It On" because both songs are administered through Sony/ATV.  Furthermore, "Let's Get It On" is available on every major digital retailer and streaming service including, without limitation, iTunes and Amazon.

65.     The melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements of the "Thinking Out Loud" composition are substantially and/or strikingly similar to those elements of the "Let's Get It On" composition.  The instant Defendants copied, reproduced, distributed, and/or publicly performed copyrightable elements of "Let's Get It On" specifically, the melody, harmony, drums, bass line, backing chorus, tempo and syncopation of "Let's Get It On", without authorization. The two works in question are therefore substantially similar.

66.     To date, each of the Defendants reproduced, distributed, publicly performed, and/or authorized the reproduction, distribution, and public performance of the infringing

composition and sound recording "Thinking Out Loud" and each of the Defendants continues to infringe "Let's Get It On".

67.     Upon information and belief, the Defendants were notified of the infringement at least as early as April 15, 2015 (the "Notice").  Despite, upon information and belief, receiving the Notice, the Defendants continued to exploit "Thinking Out Loud" without permission, by using the melodic, harmonic, drums, bass line, backing chorus, tempo and syncopation elements copied from "Let's Get It On" composition, which use constitutes copyright infringement.

68.     Despite, upon information and belief, the Notice, all of the Defendants have continued to infringe Plaintiff's copyrighted work. The infringement by the Defendants is willful, as evidenced by their continuing to infringe "Let's Get It On" after the Notice, upon information and belief, was provided to them.

69.     The Defendants knowingly and intentionally infringed Plaintiff's rights.  The Defendants' collective knowledge and intent are established by, among other things, the fact that Defendants to this day have neither sought, nor obtained, a license from the owners of the rights. All conditions precedent to the maintenance and/or establishment of the instant action have been satisfied and/or, otherwise, waived by the Defendants.


### FIRST CAUSE OF ACTION

### (Willful Copyright Infringement – 17 U.S.C. § 101, *et seq.*)

70.     Plaintiff repeats and realleges each of the foregoing Paragraphs as though fully set forth herein.  The Defendants' reproduction, distribution, and public performances of the infringing work, "Thinking Out Loud" in the United States and internationally, continue to this day, and Defendants have not deigned to compensate the copyright owners of the Work

(including SAS) for the use of the copyrighted work in "Let's Get It On".  The Defendants' reproduction, distribution, public performance, streaming, concerts, merchandizing, synchronization, licensing and economic exploitation of "Thinking Out Loud", and authorizing others to do the same, infringes Plaintiff's exclusive rights under the Copyright Act.

71.     The conduct of the Defendants is knowing and willful.

72.     As a direct and/or proximate result of the Defendants' wrongful conduct, the Plaintiff has been irreparably harmed, suffered damage, and Defendants have profited in an amount in the amount of hundreds of millions of dollars and to be determined at trial.

73.     One or more of the Defendants infringed on Plaintiff's exclusive copyright in "Let's Get It On" when it distributed and sold sound recordings, including compact discs, phonorecords, digital downloads, licenses, streaming, ringtones, ringbacks, and all other economic exploitation and video recordings, embodying "Thinking Out Loud". Such reproduction and release was wholly unauthorized, as it was without any license or consent of authority from the Plaintiff. By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

74.     The Defendants infringed Plaintiff SAS's exclusive copyright in "Let's Get It On" when they issued and/or authorized others to issue licenses to third parties for the use, publication, and exploitation of "Thinking Out Loud".  Said licenses were issued without any consent or authority from the copyright owners (including Plaintiff SAS) of "Let's Get It On," from which "Thinking Out Loud" was substantially copied.  By virtue of this unauthorized commercial exploitation, Defendants have realized illegal revenues.

75.     As a direct and/or proximate result of the Defendants' infringement on Plaintiff's exclusive copyright in "Let's Get It On", Plaintiff has suffered damages.  Said injuries are

continuing and will not abate in the future.

76.     Pursuant to 17 U.S.C. § 504(c), the Plaintiff is entitled to statutory damages since the infringement occurred after the copyrights were registered.

**WHEREFORE,** the Plaintiff SAS respectfully request that judgment be entered against the enumerated Defendants, as follows:

A.     For judgment that Defendants have violated the Copyright Act and that all such violations have been willful; and

B.     For judgment assessing Defendants for the damages in excess of one hundred million dollars ($100,000,000.00) suffered by Plaintiff, including an award of actual damages and Defendants' profits attributable to the infringement, or statutory damages (at Plaintiff's election) under the Copyright Act, as well as costs and attorney's fees to the full extent provided for by Sections 501, 504 and 505 of the Copyright Act, 17 U.S.C. §§ 501, 504 and 505; damages and profits shall include all profits and damages resulting from exploitation of the work domestically and internationally, as well as any and all profits and damages in the following categories attributable to the infringement, including but not limited to:

1.     Record sales;
2.     Downloads;
3.     Ringtones;
4.     Ringback tones;
5.     Public performance revenues;
6.     Digital revenue;
7.     Streaming revenue;
8.     Synchronization licensing;
9.     Merchandising;
10.    Public appearances;
11.    Endorsements;
12.    Sponsorships;
13.    Spokesperson work;
14.    Touring revenue;
15.    Advertising revenue;
16.    Appearance fees;
17.    Name and likeness income and increase in value;
18.    Rights of publicity income and increase in value;

19.    Increased value of all Defendants' publishing and/or record company and/or companies;

20.    Increased value of all Defendant's, including Sheeran's catalog;

21.    Increased value of music publishing and/or record royalties and rights;

22.    Increased value of social media rights, accounts and value;

23.    Increased goodwill;

24.    Promotional value;

25.    Increased value of royalty rate for record deals;

26.    Increased value in distribution deals, negotiating power and reduction in costs;

27.    Value of obtaining lower cost of administration fees and/or increased advances for publishing deals;

28.    Value of obtaining better terms for record company advances and terms and multi-record deals;

29.    Value of obtaining better terms of publishing and/or recorded master deals for Sheeran's existing catalogue and for future works;

30.    Increased value in negotiating 360 deals with record companies and/or publishers;

31.    Sheet music sales and sheet folio income;

32.    Any and all music publisher income;

33.    Any and all record master income;

34.    Any and all record income;

35.    Any and all SoundExchange, BMI, ASCAP, PRS, SESAC, PPL, SOCAN, MCPS, Harry Fox Agency, and any and all collection society, mechanical society and performance society income worldwide;

36.    Any and all producer royalty income;

37.    Any and all arrangement income;

38.    Any and all income derived from any existing medium or any medium hereinafter developed worldwide;

39.    Any and all income from any new collection society and/or collection agency to be created anywhere in the world, including by the U.S. Congress under the Music Modernization Act;

40.    Any and all income from any society to which any Defendant belongs or joins in the future;

41.    Any and all income and/or residuals from SAG-AFTRA;

42.    Any and all income from Apple, iTunes, Amazon, Spotify, Pandora, Rhapsody, and any and all download and streaming services; and

43.    Any and all of Defendants' equity interests in Spotify, and any other music streaming or download services or companies in

which one or more Defendant has an interest, as it relates to the value from the inclusion of the infringing song in the service; and

C.      For judgment granting such other, further, and different relief as to the Court may seem just and proper, including Plaintiff's costs and reasonable attorneys' fees.

## <u>REQUEST FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury as to all issues triable by jury, as enumerated and set forth in more detail in this Complaint.

Dated:  New York, New York
       May 30, 2019

PARNESS LAW FIRM, PLLC

By:_____/s/ Hillel I. Parness_____
Hillel I. Parness
136 Madison Ave., 6th Floor
New York, New York  10016
(212) 447-5299
hip@hiplaw.com
*Attorneys for Plaintiff*
*Structured Asset Sales, LLC*