UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

STRUCTURED ASSET SALES, LLC,    :

    :  Index No. 1:18-cv-5839 (LLS)

    Plaintiff,    :

    :

    v.    :  **RESPONSE AND**

    :  **COUNTERSTATEMENT OF**

EDWARD CHRISTOPHER SHEERAN, p/k/a  :  **MATERIAL FACTS OF**

ED SHEERAN, SONY/ATV MUSIC  :  **STRUCTURED ASSET SALES,**

PUBLISHING, LLC, ATLANTIC  :  **LLC MADE PURSUANT TO**

RECORDING CORPORATION d/b/a  :  **LOCAL CIVIL RULE 56.1(B), IN**

ATLANTIC RECORDS, BDI MUSIC LTD.,  :  **OPPOSITION TO DEFENDANTS'**

BUCKS MUSIC GROUP LTD., THE  :  **RENEWED MOTION FOR**

ROYALTY NETWORK, INC., DAVID PLATZ  :  **SUMMARY JUDGMENT AND IN**

MUSIC (USA) INC., AMY WADGE, JAKE  :  **SUPPORT OF PLAINTIFF'S**

GOSLING and DOES 1 THROUGH 10,  :  **RENEWED CROSS-MOTION FOR**

    :  **<u>SUMMARY JUDGMENT</u>**

    Defendants,    :

--------------------------------------------------------- X

        Plaintiff Structured Asset Sales ("SAS" or "Plaintiff"), by and through its

undersigned attorneys, pursuant to Local Civil Rule 56.1(b), submits this Response to the

Statement of Material Facts submitted by Defendants Edward Christopher Sheeran, p/k/a

Ed Sheeran, Sony/ATV Music Publishing, LLC, Atlantic Recording Corporation d/b/a

Atlantic Records, BDI Music Ltd., Bucks Music Group Ltd., The Royalty Network, Inc.,

David Platz Music (USA) Inc., Amy Wadge and Jake Gosling (collectively,

"Defendants") (ECF 201) in support of their Renewed Motion for Summary Judgment

(ECF 199) and Counterstatement of Material Facts in Opposition to Defendants' motion

and in support of SAS's Renewed Cross-Motion for Summary Judgment.

        As reflected herein and in the accompanying papers, including the Certification of

Hillel I. Parness ("Parness Cert."), and the exhibits attached thereto, the facts put forth by

Defendants include material facts that are in fact disputed, and there are additional

material facts that may or may not be disputed by Defendants.  All of this warrants denial of Defendants' Renewed Motion for Summary Judgment and grant of Plaintiff's Renewed Cross-Motion for Summary Judgment.

### Plaintiff's Responses to Defendants' Local Civil Rule 56.1 Statement of Material Facts

**I.    Procedural Background**

1.      Plaintiff Structured Asset Sales, LLC ("SAS") commenced this action on June 28, 2018 by filing a complaint, alleging that the musical composition Thinking Out Loud ("TOL") infringes the registered copyright in the musical composition Let's Get It On ("LGO"). (ECF 1).

**Response:** Undisputed.

2.      SAS twice amended its complaint; the operative pleading is the Third Amended Complaint ("TAC"). (ECF 102; Declaration of Donald S. Zakarin ("dated April 5, 2021 ("Original Zakarin Decl."), available at ECF 179, at Exhibit 11).

**Response:** Undisputed.

3.      Defendants filed Answers to the TAC on July 8, 2019 and August 26, 2019. (ECF 109-113, 118).

**Response:** Undisputed.

4.      With a single narrow exception (documents concerning Sheeran income for United States concerts and merchandise sold at such concerts, which was the subject of a pending motion), fact discovery concluded on December 26, 2019. (ECF 103, 146).

**Response**: Disputed.  On April 7, 2020, Plaintiff wrote to the Court regarding the case schedule, asking for additional time to complete fact and expert discovery in light of, among other things, the impact of the COVID-19 pandemic.  ECF 145 ("SAS was and is willing to make some concessions, but does not believe it has waived any of its discovery rights").  SAS repeated its position on April 8, 2020.  ECF 147 ("SAS respectfully requests that the Court adjust

the current schedule in this case in the manner we proposed in our letter of April 7 (ECF 145),
beginning with June 30, 2020 as the date by which to raise any remaining fact discovery issues,
with fact depositions and the expert schedule following from there, once COVID-19 restrictions
are lifted").

On April 16, 2020, the Court issued an Order, referencing ECF 145-150, writing that the
requests regarding the "deposit copy" issue "are resolved as follows: Defendants' statement on
page two of their counsel's April 10, 2020 letter, that 'Defendants are prepared to file a motion
for summary judgment based on the deposit copy' is allowed, and they may do so without any
further need for a pre-motion conference." ECF 151. The Court declined to address Plaintiff's
request to make a "deposit copy" motion.

By Endorsement dated May 4, 2020, the Court clarified that with respect to its April 16
Order (ECF 151), other than allowing Defendants to make a motion "based on the deposit copy,"
all other matters in "were simply left open, to be dealt with if necessary in light of the clarifying
effects of a motion for summary judgment." ECF 155.

On June 25, 2020, after Defendants objected to Plaintiff's service of expert rebuttal
reports, the Court wrote: "The scheduling orders nowhere forbade rebuttal reports, and both sides
may use them. If that requires a re-scheduling of an expert's deposition, so be it." ECF 174. On
September 3, 2020, after the parties made a joint request for additional time to take expert
depositions due to the challenges presented by the COVID-19 pandemic, the Court wrote "I
would give great weight to the joint conclusion of counsel of whether expert depositions should
be taken remotely or in-person in each expert's case, and to the dates which collectively serve
them best. When counsel suggest their proposals on these matters and the dates for expert
depositions, I expect to approve them unless some unforeseen good cause forbids it." ECF 177.

The September 3, 2020 Endorsement was the last entry on the docket before Defendants' April 5, 2021 Motion for Summary Judgment (ECF 178-81) and Motion In Limine (ECF 182-84).

5.      Further to the Court's Opinion and Order dated January 15, 2020 (ECF 144), Defendants completed their production of Sheeran concert and merchandise income on May 14, 2020. (Original Zakarin Decl. ¶ 7).

**Response:** Disputed.  Defendants purport to have completed their production of Sheeran concert and merchandise income, but SAS lacks sufficient information to know whether Defendants have or have not in fact completed their production or produced all documents required by the Federal Rules of Civil Procedure and the Local Rules of this Court.

6.      On April 22, 2020, SAS submitted an expert musicologist report authored by John Covach, Ph.D. ("Dr. Covach") (the "Covach Report"). (Original Zakarin Decl. at Exhibit 1).

**Response:** Undisputed.

7.      On May 22, 2020, Defendants submitted an expert musicologist report authored by Lawrence Ferrara, Ph.D. ("Dr. Ferrara"), including a response to the Covach Report (the "Ferrara I Report"). (Original Zakarin Decl. at Exhibit 2).

**Response:** Undisputed.

8.      On May 6, 2020, SAS submitted an expert musicologist report authored by Walter Everett ("Dr. Everett") (the "Original 2020 Everett Report"). (Original Zakarin Decl. at Exhibit 3).

**Response:** Undisputed.

9.      The Original 2020 Everett Report lacked information required by Rule 26 for an expert report, and Defendants so advised SAS. (Id. at Exhibit 4).

**Response:** Undisputed.

10.     On May 24, 2020, two days after receipt of the Ferrara I Report, SAS, in addition to supplying the required information omitted from the Original 2020 Everett Report and without permission or consent from Defendants, submitted a "Revised" expert musicologist report authored by Dr. Everett (the "Revised 2020 Everett Report," together with the Original 2020 Everett the "2020 Everett Reports"). (Id. at Exhibit 5).

**Response:** Undisputed.

FOOTNOTE 3: Unless otherwise noted, references to the "2020 Everett Report" correspond to the Revised 2020 Everett Report.

**Response:** Undisputed.  Plaintiff will follow the same convention herein.

11.     The Revised 2020 Everett Report deleted, among other things, Dr. Everett's prior admission in Paragraph 6 of the Original 2020 Everett Report that the I-iii-IV-V chord progression used in LGO was one of "the most common major-key progressions opening with [a I chord]." (Id.).

**Response:** Disputed.  The following language was unchanged between the Original 2020 and Revised 2020 Everett Reports: "In order of decreasing frequency of appearance, based on a study of more than 6,000 tonal songs of the 1950s through the 1970s, the most common major-key progressions opening with I are:"  Original Zakarin Dec. Ex. 3 (ECF 179-3) at 4 ¶ 6, Ex. 5 (ECF 179-5) at 4 ¶ 6, Ex. 6 (ECF 179-6) at 4 ¶ 6.

The following edit was made to a later section of the Report:

Original: "Among the most common progression classes beginning with I listed above, however, the sixth most commonly heard is I - iii - IV - V. **This is the progression shared between our exhibits by Marvin Gaye - Edward Townsend and Ed Sheeran**."

Revised: "Among the progression classes beginning with I listed above, however, **the progression class shared between our exhibits by Marvin Gaye - Edward**

**Townsend and Ed Sheeran, I - iii - IV - V, is uncommon, with far fewer examples than any of those progressions listed above it**."

Original Zakarin Dec. Ex. 3 (ECF 179-3) at 4-5 ¶ 7, Ex. 5 (ECF 179-5) at 4-5 ¶ 7, Ex. 6 (ECF 179-6) at 4-5 ¶ 7. Defendants' suggestion that this edit changed the substance of the Report is false and without foundation.

FOOTNOTE 4: A redline comparing the Original Everett Report against the Revised Everett Report is annexed to the Zakarin Declaration as Exhibit 6.

**Response:** Undisputed.

12.      On June 21, 2020, SAS submitted a "Rebuttal Report" from Dr. Covach, responding to the Ferrara I Report (the "Covach Rebuttal Report"). (Id. at Exhibit 7).

**Response:** Undisputed.

13.      On June 23, 2020, Defendants submitted a "Rebuttal Report" from Dr. Ferrara, responding to the Original 2020 Everett Report and the Revised Everett Report (the "Ferrara II Report"). (Id. at Exhibit 8).

**Response:** Undisputed.

14.      On June 23, 2020, Defendants submitted an expert musicologist report authored by Anthony Ricigliano ("Mr. Ricigliano") responding to the Original 2020 Everett Report and the Revised 2020 Everett Report (the "Ricigliano Report"). (Id. at Exhibit 9).

**Response:** Undisputed.

15.      On July 21, 2020, Defendants submitted a "Rebuttal Report" from Dr. Ferrara, responding to the Covach Rebuttal Report (the "Ferrara Rebuttal Report"). (Id. at Exhibit 10).

**Response:** Undisputed.

16.      On April 16, 2020, the Court granted Defendants leave to seek summary judgment without further notice. (ECF 151).

**Response:** Disputed.  ECF 149, 151.  This issue has been rendered moot by the Court's September 9, 2021 Opinion and Order ("Original MIL Opinion") (ECF 197) concerning Defendants' April 5, 2021 Motion *in limine* to Exclude the Reports and Testimony of Dr. John Covach and Dr. Walter Everett (ECF 182-184) ("Original MIL"), but SAS reserves its rights with respect to the "deposit copy" issue.

FOOTNOTE 5: While Defendants originally contemplated moving for summary judgment after the completion of expert depositions, because Covid restrictions and medical safety dictated that in-person depositions be deferred until in-person activity was safe and because both SAS and Defendants agreed that deposing musicologists cannot effectively be conducted remotely, the depositions of musicologists have not yet been conducted. Nevertheless, given the passage of time and because Defendants maintain that the admissions contained in the Covach Reports and Everett Report, even without the benefit of depositions, warrant summary judgment, Defendants have determined to move in advance of deposing SAS's musicologists.

**Response:** Disputed.  ECF 149, 151.  This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.  For the avoidance of doubt, Plaintiff has not waived, and does not forego, the right to depose Defendants' experts.

Supplemental Statement No. 1. In its Daubert Order, the Court determined that SAS had caused "waste and confusion" by "failing to take seriously the understanding that 'copyright law protects only that which is literally expressed, not that which might be inferred or possibly derived from what is expressed.'" (ECF 197 at 3 (citation omitted)).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.

Supplemental Statement No. 2. In its Daubert Order, the Court reiterated the Ninth Circuit's holding in Skidmore and its own earlier ruling in *Griffin* that the "Deposit Copy is the sole definition of the elements included in the protection of copyright," and held that the LGO Recording "is inadmissible in any way which might confuse the jury into thinking it represents what is protected by copyright." (Id.).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.

Supplemental Statement No. 3. In its Daubert Order, the Court permitted SAS to submit amended expert reports consistent with four specific requirements set forth in the Daubert Order. (Id.).

**Response:** Disputed.  The Court <u>directed</u> Plaintiff to serve revised expert reports upon Defendants that did not include certain items.  ECF 197.

Supplemental Statement No. 4. First, the Court ruled the amended reports "must delete all references to the Gaye sound recording." (Id. at 3).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.

Supplemental Statement No. 5. Second, the Court barred SAS's experts from opining on prior art, ruling "the proof as to the existence of prior art shall be only that submitted by defendants" since Dr. Covach "ignored the issue of prior art," and Dr. Everett "made inquiries so superficial as to amount to no [prior art] research at all." (Id. at 4).

**Response:** Disputed.  The quoted language is incomplete and taken out of context.  ECF 197.

Supplemental Statement No. 6. Third, the Court held that the amended reports must "eschew opinions unsupported by facts, or suggesting legal conclusions." (Id.).

**Response:** Disputed. The quoted language is incomplete and taken out of context. ECF 197.

Supplemental Statement No. 7. Fourth, the Court rejected the theory of "functional equivalence" proffered by SAS, describing it as a "concoction" that had "serious analytic problems." (Id. at 3).

**Response:** Disputed. The quoted language is incomplete and taken out of context. ECF 197. Furthermore, as discussed in the accompanying Memorandum of Law, Dr. Covach's references to "functional equivalence" related to the functional equivalence of certain chord sequences, and not to the interpolation of a bass line from sheet music, which is what the Court was referring to.

Supplemental Statement No. 8. On September 14, 2021, this Court denied the Original Summary Judgment Motion "without prejudice to renewal after submission of Plaintiff's expert's final reports, addressing only claimed infringement of the Deposit Copy." (ECF 198).

**Response:** Disputed. The quoted language is incomplete and taken out of context. ECF 197.

Supplemental Statement No. 9. On October 8, 2021, SAS submitted (1) a "revised" original report of Dr. Covach ("Revised Covach Report"), (2) a "revised" rebuttal report of Dr. Covach ("Revised Covach Rebuttal") and (3) a "revised" Report of Dr. Everett ("Revised Everett Report") (collectively, the "Revised Reports"). (Renewed Zakarin Decl. at Exhibit 3, 5 and 7).

**Response:** Undisputed.

FOOTNOTE 6: Redlines comparing the Revised Reports to the original Reports are annexed to the Renewed Zakarin Declaration as Exhibits 4, 6 and 8.

**Response:** Undisputed.  The Redlines were voluntarily prepared by Plaintiff's counsel.

## II.    Let's Get It On

17.    Edward Benjamin Townsend ("Townsend") and Marvin Gaye Jr. ("Gaye") authored LGO in 1973. (TAC ¶ 1).

**Response:** Undisputed.

18.    SAS purports to have acquired a one-third share of Townsend's two-thirds songwriter share of LGO (the songwriter share represents a 50% interest in LGO, with the other 50% share being the publisher share owned by Stone Diamond Music Corp. ("Stone Diamond"), an affiliate of Jobete Music Company ("Jobete"), both of which were affiliated with Motown Records), which would provide SAS with an 11 and one-ninth percent beneficial interest in LGO (i.e., an 11.11% interest). (TAC ¶ 16).

**Response:** Undisputed.

19.    On or about July 17, 1973, music publishers Stone Diamond and Cherritown Music Co. ("Cherritown Music"), Ed Townsend's own music publishing company, as copyright owners, filed an Application for Registration of a Claim to Copyright with the U.S. Copyright Office for the musical composition LGO (the "Copyright Application"). (Original Zakarin Decl. at Exhibit 12).

**Response:** Undisputed, except to note that there are two 1973 registrations for LGO.  The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.

20.     In support of the Copyright Application, Stone Diamond and Cherritown Music deposited sheet music with the U.S. Copyright Office for LGO (the "Deposit Copy"). (Id.).

**Response:** Undisputed, except to clarify that what was submitted was sheet music written in the "lead sheet" notation style (Revised Covach Report (ECF 200-7) ¶ 10; Revised Everett Report (ECF 200-11) ¶ I.A.7), and to note that there are two 1973 registrations for LGO. The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.

21.     The Copyright Office ultimately registered LGO for copyright – as memorialized by the Deposit Copy – under Registration No. EP 314589. (Id.; Original Zakarin Decl. at Exhibit 13).

**Response:** Disputed. This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue. Also, there are two 1973 registrations for LGO. The composition was registered for copyright in 1973 under EU422281 and EP314589, and copyright was automatically renewed in 2000 under RE 0000848835 and RE 0000840063.

22.     The musical elements notated in the Deposit Copy include only the following elements: key, meter, harmony (i.e., the chord progression), rhythm, melody, lyrics and song structure. (Id.; Ferrara I Report ¶¶ 23-24).

**Response:** Disputed. This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

23.     The Deposit Copy does not notate, among other things, a bass-line, percussion elements (e.g., drums) or a tempo in which to perform the composition (i.e., the number of beats

per minute, which dictates how fast or slow the composition is to be performed). (Id.; see also Revised Covach Report ¶ 8; Revised Covach Rebuttal ¶ 6).

**Response:** Disputed.  This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

## III.    Thinking Out Loud

24.    On or about February 3, 2014, Sheeran and Wadge co-authored TOL in Suffolk, England. (Sheeran Tr. at 62:12-20, 128:8-129:24;4 Declaration of Amy Wadge dated June 28, 2018 ("Wadge Decl." or "Wadge Declaration") at ¶¶ 3-7).

**Response:** Undisputed that Sheeran and Wadge so testified.

25.    Sheeran testified that he did not copy LGO when authoring TOL, and that he and Wadge independently created TOL at his home, with Wadge authoring the chords. (Sheeran Tr. at 62:12-67:10, 78:12-79:18).

**Response:** Disputed. Sheeran was never asked about copying and the testimony cited contains no denial of copying or claim of independent creation. Here is the actual testimony:

> Q. At the time that Ms. Wadge and you were writing "Thinking Out Loud", was there any discussion about any similarities or possible perceptions to that and "Let's Get It On"?
>
> A. No.
>
> Q. Okay. Any time after that, before it was released?
>
> A. No.
>
> Q. Okay.
>
> A. It was always called the Van Morrison song, always.
>
> Q. Okay.

MR. FRANK: Why was it called the Van Morrison song?

Q. Yeah, why was it called the Van Morrison song?

A. It emulates the sounds, I guess; piano, guitar, drums, song about love.

Sheeran Tr. (ECF 179-14), 78:23-79:18.

26.    On February 5, 2014, Sheeran recorded what would become the commercially released version of TOL at Sticky Studios in Surrey, England. (Id. at 128:8-129:24; Declaration of Jake Gosling dated July 26, 2018 ("Gosling Decl." or "Gosling Declaration") at ¶ 3, annexed to Original Zakarin Declaration at Exhibit 16).

**Response:** Undisputed that Gosling so testified.

27.    The commercially released recording of TOL includes, among other things, electric-guitar, bass-guitar, piano, organ, lyrics, vocals and percussion/drums. (Ferrara I Report at Audio Exhibit 1, Track 1).

**Response:** Undisputed.

28.    Sheeran and Wadge did not author the bass-guitar part or the drum part in TOL. (Sheeran Tr. 128:8-130:23; Gosling Decl. ¶¶ 3-6).

**Response:** Disputed. Sheeran testified that Gosling "added" the drums and bass; there is no testimony as to who composed the drums and bass. Sheeran Tr. (ECF 179-14), 128:8-130:23; Gosling Dec. (ECF 179-16) ¶¶ 3-6.

FOOTNOTE 7: Excerpts of the Sheeran Transcript ("Sheeran Tr.") from the action captioned Griffin v. Sheeran, et al., Case No. 17-cv-5221 (the "Griffin Action") are annexed as Exhibit 14 to the Original Zakarin Declaration. The parties have agreed to the use in this action of materials exchanged during discovery in the Griffin Action. (Original Zakarin Decl. ¶ 26).

**Response:** Undisputed.

FOOTNOTE 8: A copy of the Wadge Declaration, submitted in the Griffin Action, is annexed as Exhibit 15 to the Original Zakarin Declaration. While there is no evidence that contradicts the testimony of Mr. Sheeran and of Ms. Wadge, Defendants' motion is not dependent on their testimony. Rather, this motion is based on the admissions of SAS's own musicologists, which confirm that there is no viable claim of infringement in this case.

**Response:** Undisputed as to the first sentence.  Disputed that there is no evidence that contradicts the testimony of Mr. Sheeran and Ms. Wadge, and disputed that Defendants have grounds for summary judgment under any circumstances.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.  Please see Plaintiff's responses to paragraphs 25 and 28, which are incorporated in full into this response.

## IV.    Musical Comparison Of LGO And TOL

### Key & Meter

29.    The Deposit Copy is written in the key of E-flat major and in 4/4 meter. (Ricigliano Report at 12; Revised Covach Report ¶¶ 7-8).

**Response:** Undisputed.

30.    TOL is written in the key of D major and in 4/4 meter. (Ricigliano Report at 12; Revised Covach Report ¶ 7).

**Response:** Undisputed.

31.    Due to its ubiquity in popular music, 4/4 meter is also known as "common time." (Ferrara I Report ¶ 68).

**Response:** Undisputed that 4/4 meter is known is "common time" or "quadruple time." Disputed that the naming has anything to do with "popular music."

14

Chord Progressions

32.    The LGO Deposit Copy features a I-iii-IV-V7 (or a 1-3-4-5) chord progression. (Ferrara I Report ¶ 32; Revised Covach Report ¶ 6; Revised Everett Report at 5).6

**Response:** Undisputed.

FOOTNOTE 9: A "7" denotes the addition of a pitch that is the interval of a minor seventh above the root or name of the chord. (Ferrara I Report ¶ 32 n.14).

**Response:** Undisputed.

33.    None of the chord progressions in TOL are the same as the I-iii-IV-V7 (or simplified I-iii-IV-V) chord progression used in LGO. (Ferrara I Report ¶ 39; Revised Covach Report ¶ 6).

**Response:**  Disputed.  Dr. Covach explains as follows in his opening report:

Using this system, the chord progression employed in the backing pattern of Gaye and Townsend's song may be written as I – iii – IV – V (see example 1a). This is a very common progression, used in many songs, and by itself—as an isolated entity—does not constitute an element that one could copyright in most cases. The Sheeran and Wadge work employs a slight adjustment to this chord pattern: the I, IV, and V chords are maintained from the Gaye and Townsend work, but the iii is replaced with a common substitute. As any freshman harmony textbook will attest, the I chord with the third scale degree in the bass may stand in (or substitute) for the iii chord without affecting the function of the progression. The Sheeran and Wadge work uses this chord, commonly labeled "I6," as a slight modification the Gaye and Townsend original (see example 1b), producing a <u>mild variant that is harmonically equivalent: I – I6 – IV – V</u>.



*Examples 1a (Gaye-Townsend) and 1b (Sheeran-Wadge): chord progressions compared*

Revised Covach Report (200-7) ¶ 6 (emphasis added) (citing and quoting from an undergraduate music textbook for the proposition that "iii may substitute for I6 to create a tonic extension").

Dr. Everett, similarly, explained the equivalence between the iii and I6 chords, and thus the equivalence between the two primary chord patterns:

> For our purposes, we must recognize the essential functional identities of the I6 chord and the iii chord as being indistinguishable. Both triads appear over ^3 in the bass; both also include both ^3 and ^5 in common among upper voices. The only difference in their identity is the inclusion of ^1 (= ^8) in the I6 chord, as opposed to ^7 in the iii chord. Particularly among texturally less significant inner voices, these two pitches just a half step apart (^8 and ^7) sound interchangeable, registering only differences of color between them. (^8 and ^1 are exactly the same scale degree, given that the scale replicates in octaves. We will refer to ^1 as ^8 when recognized in connection to its neighbor, ^7) Often, any difference between the two chords I6 and iii is unrecognizable, especially if ^3 is present in both outer voices, the lead vocal as well as the bass.
>
> ….
>
> Another perspective will add weight to what might be for some an anti-intuitive argument, that the minor iii chord could be equivalent to a major I6 triad. This relates to the interchangeability of the two triads, based largely on the fact that scale degrees ^3 and ^5 are common to both. [Providing example]. Thus, iii is here equivalent to the I which it replaces (because of ^5 and ^3, common between them, emphasized in the vocal, and because the tiny difference between ^8 and ^7 is buried in an inner voice), but iii is even closer to I6 than to I.

Revised Everett Report (ECF 200-11) ¶¶ I.A.4-5.  Dr. Everett goes further to explain why – in his view – the progression one hears in TOL is the same as the LGO sheet music:

> it is clear from the Gaye - Townsend written notation that the "iii" chord, Gm, can be performed interchangeably with the "I6" chord, Eb/G, as long as ^3 is played in the bass. Therefore, Sheeran's band (which performs I6 chords more often than iii chords) performs identical chord progressions to those notated in the Gaye - Townsend deposit copy.

Revised Everett Report (ECF 200-11) ¶ I.A.7 (emphasis added).

Dr. Ferrara, Defendants' musicology expert, takes issue with Drs. Covach's and Everett's views on the equivalence of the chord progressions in TOL and LGO, but Dr. Covach responds to those criticisms, driving home the point that we are dealing with experts with materially differing opinions that cannot be resolved on a motion for summary judgment.  Dr. Covach

builds upon the single undergraduate music textbook he cites in his opening report, arguing

based on multiple sources that there is a "consensus among experts" on the subject that Dr.

Ferrara choses to ignore:

> The textbook in use in Dr. Ferrara's own department at New York University is The Musician's Guide to Theory and Analysis by Jane Piper Clendinning (Florida State University) and Elizabeth West Marvin (Eastman School of Music). Clendinning and Marvin write: "The progression I – iii may in fact be considered a variation of I – I6."2 Similar passages may be found in widely used textbooks by Miguel A. Roig-Francoli (Cincinnati College-Conservatory of Music) and L. Poundie Burstein (CUNY) and Joseph N. Straus (CUNY).3 Yet in spite of this general consensus among experts writing on the functional equivalence of I6 and iii in this harmonic context, Dr. Ferrara writes that "not one of the chord progressions in TOL is the same as the I – iii – IV – V7 (or even I – iii – IV – V) chord progression in LGO" (¶40, p. 15-16). <u>Dr. Ferrara is out of step with his colleagues owing to the narrowness of his interpretation; he seems to argue that because one thing is a slight variation of another, these two things are completely different</u>. They are, according to consensus among experts, very similar.

Revised Covach Rebuttal (ECF 200-9) ¶ 4 (emphasis added).

    34.    TOL features multiple, different chord progressions, including:

I5-I6-IV5-Vsus2

I5-I6-IV5-V5

I-I6-IV-Vsus2

I-I6-IV-V

I-I6-IV-V11

I-I6-IV-Vsus4

vi-V-IV-I6-ii7-V-I

(Ferrara I Report ¶¶ 39, 47).

    **Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is

incorporated in full into this response.

FOOTNOTE 10: A "I6" chord also can be written as a "I/3" chord. (Ferrara II Report ¶ 9 n.3).

**Response:** Undisputed.

35.    A "I6" chord, a major chord, is different from a "iii" chord, a minor chord. (Ferrara II Report ¶¶ 9-15; Ferrara Rebuttal Report ¶¶ 2-5, 7).

**Response:** Undisputed that the two chords do not have identical notes, but disputed that these differences have relevance to the musicological analysis at issue here.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.

36.    SAS has admitted that the I-iii-IV-V progression "is a very common progression, used in many songs, and by itself – as an isolated entity – does not constitute an element that one could copyright in most cases." (Revised Covach Report ¶ 6; emphasis added; see also Original 2020 Everett Report at 4-5).

**Response:** Undisputed that the incomplete quote above is from Dr. Covach's report, but disputed that Dr. Covach's views as to what one could or could not <u>copyright</u> has relevance to the musicological analysis at issue here.  Indeed, Defendants have criticized SAS's experts from even using language that could be construed as relating to copyright law.

37.    In addition to the admission of Dr. Covach in the Revised Covach Report, Defendants have identified at least 52 songs that utilize a I-iii-IV-V or I-I6-IV-V chord progression. (Ferrara I Report at Visual Exhibit H; Ricigliano Report at 8).

**Response:** Undisputed that Dr. Ferrara purports to identify 52 such songs, but disputed that what Dr. Ferrara said is tied to what Dr. Covach said, and disputed that Dr. Covach made an "admission."  Please see Plaintiff's response to paragraph 36, which is incorporated in full into this response.

38.     A guitar method book, titled Guitar for Advanced Beginners, states that "dozens of other I-iii-IV-V songs" predated LGO and that the authors of LGO were "simply writing a song using a common progression, just like every other professional songwriter does." (Ferrara I Report at Visual Exhibit E).

**Response:** Disputed as the document is inadmissible hearsay.  In addition, Plaintiff notes that the book was published more than twenty-five years after Let's Get It On was written. Ferrara I Report at Visual Exhibit E.

39.     A guitar method book, titled Money Chords, identifies the I-iii-IV-V progression as "a popular chord progression" and one of the "most frequent chord progressions." (Ferrara I Report at Visual Exhibit D).

**Response:** Disputed as the document is inadmissible hearsay.  In addition, Plaintiff notes that the book was published more than twenty-five years after Let's Get It On was written. Ferrara I Report at Visual Exhibit D.

40.     A piano method book, titled How To Play Rock 'N' Roll Piano, copyrighted in 1967, six years prior to the creation of LGO, identifies the I-iii-IV-V chord progression as one of ten "popular rock 'n' roll progressions." (Original Zakarin Decl. at Exhibit 17).

**Response:** Disputed as the document is inadmissible hearsay.

Harmonic Rhythms

41.     SAS alleges that TOL "uses the identical harmonic rhythm as found in" LGO because both songs anticipate (or syncopate) chord changes on the second and fourth chords of the four-chord progressions that SAS places in issue. (TAC ¶ 43; Revised Covach Report ¶¶ 10-11; Revised Everett Report at 13-14).

**Response:** Disputed.  Dr. Covach explains that while the two songs are notated using two

different time signatures ("fast" and "slow"), their harmonic rhythms are the same:

> Gaye and Townsend's "Let's Get It On" sets the I – iii – IV – V chord-bass
> progression to a noteworthy rhythm. This rhythm extends over two measures (or
> bars) according to a "slow" 4/4 time signature (see below), dividing the duration
> of the first two chords unevenly, as represented by the dotted quarter and eight
> note tied to a half note. The third and fourth chords divide the second measure in
> a parallel manner to the first measure. The musical notation of rhythm allows for
> alternate ways of notating the same rhythm. A second possible notation for this
> rhythm is notated below as "fast" 4/4. Note that the eighth notes in the "slow" 4/4
> are notated as quarter notes in the "fast" 4/4 version.
>
> ….
>
> Sheeran's "Thinking Out Loud" uses the identical harmonic rhythm as found in
> Gaye's "Let's Get It On." It does not require an understanding of standard
> rhythmic notation to see it in the sheet music and hear it in the music played from
> it that this rhythm is identical between the two songs.

Revised Covach Report (ECF 200-7) ¶¶ 10-11.

Dr. Everett refers to the same phenomenon as "syncopation," explaining that it is an

uncommon feature shared by LGO and TOL:

> In songs that include the I - iii - IV - V progression class, chords typically change
> every four beats (a full bar), providing a "harmonic accent" on strong downbeats
> (the first beat of every bar). Syncopated chord changes, occurring on weak beats,
> are much less common, but these are heard in both Gaye - Townsend and Sheeran
> exhibits.

Revised Everett Report (ECF 200-11) ¶ I.D.1.

Dr. Ferrara takes issues with these conclusions as well, but Dr. Covach explains that Dr.

Ferrara is disingenuously elevating form over substance, as the particular notation employed in

the sheet music for the two songs has no bearing on whether the harmonic rhythms of the two

compositions are similar:

> Dr. Ferrara argues that this difference in notational practice makes the resulting
> rhythmic pattern "not the same." And again, in a very literal (though not
> particularly musical) sense, this is true. But these rhythms are identical in sound.
> This variation in ways one may notate the same rhythmic figure is another type of

<u>basic principle we teach musicians routinely</u>. It is as if one would argue that this rebuttal would mean something different if I used 24 pt. font rather than 12 pt. My words would retain all of their meaning, even if the page were twice as big.

Revised Covach Rebuttal (ECF 200-9) ¶ 5.

42.    SAS deleted the admission from the Original Covach Report that "the harmonic rhythm common between these two songs occurs in other songs as well" and "can be thought of in terms of stylistic commonplaces." (Renewed Zakarin Decl. Exhibit 4 ¶ 18).

**Response:** Disputed.  SAS deleted the language in question in compliance with – not in violation of – the Original MIL Opinion.  Also disputed as it misstates what Dr. Covach wrote. Dr. Covach wrote "In the case of the present comparison between 'Let's Get It On' and 'Thinking Out Loud,' it is clear that certain aspects of the backing pattern described above can be thought of in terms of stylistic commonplaces."   Original Covach Report (ECF 179-1) ¶ 18.

43.    The rhythmic anticipation of chord changes is an unprotectable musical technique. (Ferrara I Report ¶¶ 16, 61; Ricigliano Report at 9; ECF 197 at 3; Griffin Action ECF 138 at 1-2).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The use of anticipation in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

44.    The rhythmic anticipation of chord changes is commonplace in popular music. (Id.; Revised Covach Rebuttal (ECF 200-9) ¶ 5).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The use of anticipation in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF

200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

45.    Dr. Covach describes anticipation as "[a] type of syncopation that is common in popular music of the 20th century," and admits that "American popular music of the last 100 years employs a high degree of rhythmic syncopation." (Revised Covach Rebuttal ¶ 5; see also Original Covach Report ¶ 18 (anticipation "occurs in other songs as well").

**Response:** Undisputed that the incomplete quotes above are from Dr. Covach's report. Undisputed that the technique, standing alone, is unprotectible.  The use of anticipation in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

46.    The technique of syncopation employed in LGO and TOL is different: LGO features a four-bar chord progression with two chords in bar 1, the continuation of the second chord in bar 1 into bar 2, two chords in bar 3, and the continuation of the second chord in bar 3 into bar 4; in contrast, TOL features a two-bar chord progression (not a four-bar chord progression), with two chords in bar 1 and two chords in bar 2. (Ferrara I Report ¶ 49).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

47.    Whereas the second chord in LGO is on beat 4 and anticipates beat 1 of measure 2, the second chord in TOL is on the second half of beat 2 and anticipates beat 3 of measure 1. (Id. ¶ 50).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

48.    Whereas the fourth chord in LGO is on beat 4 and anticipates beat 1 of measure 4, the fourth chord in TOL is on the second half of beat 2 and anticipates beat 3 of measure 2. (Id. ¶ 51).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

49.    Anticipation in LGO occurs before beat 1; anticipation in TOL occurs before beat 3. (Id. ¶ 52).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

50.    In LGO each anticipated chord has a duration of one quarter note, while each anticipated chord in TOL has the duration of an eighth note. (Id. ¶ 53).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

51.    To find equivalence between the harmonic rhythms in each work, one must disregard the objective differences recited above in Paragraphs 46 through 50 and also cut in half the value of the notes and chords in LGO. (Id. ¶ 55).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

52.    As this Court's Daubert Order has found, Dr. Covach failed to perform any prior art search and Dr. Everett's prior art analysis was so "superficial" as to amount to no prior art search, resulting in their being barred from offering any evidence as to prior art; consequently, SAS's experts failed to address the fact that Sheeran used the anticipation technique in at least twenty songs that he wrote or co-wrote prior to TOL; in ten of those twenty songs, anticipation

occurs on the second and fourth chords of the chord progression, as in TOL. (Ferrara I Report ¶ 61 & Visual Exhibit I; 2020 Everett Report at 4).

**Response:** Disputed. The quoted and paraphrased language is incomplete and taken out of context, and the Original MIL Opinion makes no mention whatsoever of Sheeran's pre-TOL songs. ECF 197. Furthermore, Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

53.    Prior to co-authoring TOL, Wadge authored a composition that includes a I-I6-IV-V chord progression that anticipates chord changes on the second, third, and fourth chords. (Ferrara I Report ¶ 63; Ricigliano Report at 19).

**Response:** Disputed. Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO. Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern." Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

<u>Melodic Elements Placed In Issue By Dr. Covach</u>

54.    At Paragraph 15 of his Revised Report, Dr. Covach notates the vocal melodies that he places in issue as follows:

| LGO | 1 | 1 | 1 | *6 | 5 | b3 | 2* | 6 | 5 | *3 | 5 | 6 | 5 | 3* | 3 | 5 | 6 | | |
|-----|---|---|---|----|---|----|----|---|---|----|---|---|---|----|---|---|---|---|---|
| TOL | 3 | 5 | *6 | 3 | 2* | 1 | 2 | 3 | 5 | 1 | *3 | 5 | 6 | 5 | 3* | 3 | 2 | 1 | 1 |

(Revised Covach Report ¶ 15).

**Response:** Undisputed.

55.        Track 2 of Audio Exhibit 1 to the Ferrara I Report includes performances of the above different melodies.

**Response:** Undisputed that Track 2 of Audio Exhibit 1 purports to include such performances.

56.        Dr. Covach's analysis of the vocal melodies omits any analysis of the rhythmic durations and metric placements of the melodies. (Ferrara I Report ¶¶ 131-32).

**Response:** Disputed that Dr. Covach "omitted" anything relevant to the musicological analysis.

57.        Differences also exist between the rhythmic durations and metric placements of the melodies in each work. (Id. ¶¶ 142-49).

**Response:** Disputed that the "differences" are relevant to the musicological analysis.

58.        The alleged similarity that exists in the pitch sequence of the second segment of the above melodic phrase that Dr. Covach places in issue lines up with greater similarity to the opening pitches of the well-known Stephen Foster song, "Camptown Races," than it does with TOL. (Id. ¶ 141).

**Response:** Disputed, as the concept of "greater similarity" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

FOOTNOTE 11: The TOL melody is set to the words "When your legs don't work like they used to before, and I can't sweep you off of your feet," and the LGO melody is set to the words "Let's get it on, sugar, let's get it on, ooh."

**Response:** Undisputed.

FOOTNOTE 12 The cited Audio Exhibit may be accessed at the following URL:

https://pryorcashman.sharefile.com/share/view/s8130f2e51a0a46cab1f8a0416d3ea0d9.

**Response:** Undisputed.

FOOTNOTE 13: For reference, "Camptown Races" includes the well-known vocal refrain "Oh, doo-dah day!"

**Response:** Undisputed.

Melodic Elements Placed In Issue By Dr. Everett

A. Dr. Everett's Third Summary Bullet

59.     Dr. Everett compares TOL's opening to the opening two phrases of LGO, through his analysis of what he refers to as the "Upper Voice" melodies. (Revised Everett Report at 5-10).

**Response:** Undisputed.

60.     The 2020 Everett Reports (and the Revised Everett Report) omit any transcription in musical notation of the "Upper Voice" melodies. (Ricigliano Report at 22; see also generally Revised Everett Report).

**Response:** Disputed that Dr. Everett "omitted" anything relevant to the musicological analysis.

61.     The actual pitch sequences of "Upper Voice" Melody Phrase 1 are:

| LGO | 3 | 4 | 5 | 4 | b3 | 2 | b3 | 2 | b3 | 2 | 2 | 2 | 1 | 2 |
|-----|---|---|---|---|----|---|----|---|----|---|---|---|---|---|
| TOL | 3 | 5 | 6 | 5 | 3  | 2 | 1  | 2 | 3  | 6 | 1 |   |   |   |

(Ferrara II Report ¶ 30).

**Response:** Disputed.  Revised Everett Report (ECF 200-11) at 6-10.

62.    Dr. Everett claims that "Upper Voice" Melody Phrase 1 begins with scale-degrees 3-4-5 in each work. (Revised Everett Report at 6-7).

**Response:** Undisputed.

63.    As shown above, only because Dr. Everett fails to transcribe TOL can he make this demonstrably false assertion; in fact, it is indisputable that TOL begins with scale-degrees 3-5-6. (Ferrara Report II ¶¶ 30-31, 39-40; see also Track 3 Audio Exhibit 1 to the Ferrara II Report).

**Response**: Disputed.  Revised Everett Report (ECF 200-11) ¶ B.1-3.

64.    In fact, even Dr. Covach's Revised Report refutes Dr. Everett's conclusion regarding the opening scale-degrees of "Upper Voice" Melody Phrase 1. (Revised Covach Report ¶ 15).

**Response**: Disputed that Dr. Covach "refutes" Dr. Everett.  Both experts are transcribing from audio recordings and there is no "official" transcription of TOL.  To the extent Dr. Covach and Dr. Everett disagree on this minor point, SAS adopts the position of Dr. Covach.  Revised Everett Report (ECF 200-11) ¶ B.1-3; Revised Covach Report (ECF 200-7) ¶ 15.

65.    The pitch sequences of "Upper Voice" Melody Phrase 2 are:

| LGO | b3 | b3 | 2 | b3 | 2 | 2 | 2 | 2 | 1 | 6 | b3 | 2 | 1 | 6 |
|-----|----|----|---|----|---|---|---|---|---|---|----|---|---|---|
| TOL | 3  | 5  | 6 | 5  | 3 | 3 | 2 | 1 | 1 |   |    |   |   |   |

(Ferrara II Report ¶ 40).

**Response**: Disputed.  Please see Plaintiff's response to paragraph 64, which is incorporated in full into this response.

FOOTNOTE 14: For ease of reference, Dr. Ferrara refers to these melodies in the Ferrara II Report as "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, which is the

terminology Defendants use herein and in the accompanying papers. (Ferrara II Report ¶¶ 30-49).

**Response:** Undisputed.

66.     For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the range of the lowest to the highest pitches is different. (Ferrara II Report ¶¶ 31-34, 42-43).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

67.     For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the specific highest and lowest pitches are different. (Id.).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

68.     For both "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, the melodic motions are different. (Id.).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.  Also disputed as to the implications of the term "melodic motion," which means nothing more than two notes in sequence.

69.     For both "Upper Voice Melody" Phrase 1 and "Upper Voice" Melody Phrase 2, the metric placements on or within beats and the rhythmic durations of the pitches are different. (Id. ¶¶ 28, 37, 45).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

70.     The 2020 Everett Report (and the Revised Everett Report) omit any analysis of the metric placements on or within beats and the rhythmic durations of the pitches for both

"Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2. (Id.; see also generally Revised Everett Report).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

71.     The objective differences between "Upper Voice" Melody Phrase 1 in each work can be heard by the naked ear on Track 1 of Audio Exhibit 1 to the Ferrara II Report.12

**Response:** Disputed, as the idea of what an unspecified person can detect with his or her "naked ear" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

72.     The objective differences between "Upper Voice" Melody Phrase 2 in each work can be heard by the naked ear on Track 2 of Audio Exhibit 1 to the Ferrara II Report.13

**Response:** Disputed, as the idea of what an unspecified person can detect with his or her "naked ear" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

73.     Pages 25 and 27 of the Ricigliano Report also include visual graphs of "Upper Voice" Melody Phrase 1 and "Upper Voice" Melody Phrase 2, which further illustrate the objective differences between each melody in each work.

**Response:** Undisputed that the Ricigliano Report includes graphs, but disputed as to the idea of what those graphs do or do not illustrate, which is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

FOOTNOTE 15: The cited Audio Exhibit may be accessed at the URL provided in Footnote 12.

**Response:** Undisputed.

FOOTNOTE 16**:** The cited Audio Exhibit may be accessed at the same URL cited in Footnote 12.

**Response:** Undisputed.

B. Dr. Everett's Fourth Summary Bullet

74.    Dr. Everett's Revised Report claims that both songs emphasize certain notes – scale degrees 5 and 3 – over the "iii" chord, and he opines that it would be more "usual" to emphasize scale degree 7 over the "iii" chord. (Revised Everett Report at 9, 17).

**Response:** Undisputed.

75.    With respect to Dr. Everett's claim about TOL not emphasizing scale degree 7 over the "iii" chord, Dr. Ferrara, Mr. Ricigliano and even Dr. Covach all agree that there is no "iii" chord in TOL (Ferrara I Report ¶ 39; Ricigliano Report at 8; Revised Covach Report ¶ 6), so Dr. Everett's assertion regarding the fact that TOL does not emphasize scale degree 7 over a nonexistent "iii" chord has no meaning. (Ferrara II Report ¶ 51).

**Response:** Disputed.  Defendants and their experts are misreading or misinterpreting Dr. Everett.  As he explains on page 10 (¶ B.7), "The Gaye - Townsend composition's upper-voice emphasis on ^5 and ^3 shown throughout the deposit copy is unusual when supported by the iii chord, which is more characteristic with ^7 in the upper voice."  The "iii chord" here refers to the second chord of the progression in the songs at issue. The unusual nature of this pairing is further melodic evidence that the iii and I6 are musicologically equivalent chords in LGO and TOL. Revised Everett Report (ECF 200-11) ¶ B.7.

76.    It is undisputed that TOL does not include a "iii" chord. (Ricigliano Report at 28-20; Ferrara II Report ¶ 51).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.

77.    Even if TOL did include a "iii" chord, which it does not, there is nothing unusual about omitting scale-step 7 in songs that use a I-iii chord progression. (Ricigliano Report at 28-29; Ferrara II Report ¶ 51).

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.  Dr. Everett's opinion is that this pairing is in fact unusual. Revised Everett Report (ECF 200-11) ¶¶ B.7.

78.    The melodies "concurrent" with the second chord of the chord sequence in each song are different. (Ferrara II Report ¶¶ 52-57).

**Response:** Disputed, as the concept of "different" melodies is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

79.    The supposed "similarity" that Dr. Everett claims regarding the absence of scale degree 7 over the non-existent "iii" chord in TOL (which has no "iii" chord) comprises matter that is not expressed rather than what is expressed. (Id.)

**Response:** Disputed.  Please see Plaintiff's response to paragraph 33, which is incorporated in full into this response.

80.    Avoiding scale degree 7 is consistent with Sheeran's general style and his earlier works. (Ricigliano Report at 30-31).

**Response:** Undisputed, but disputed that this has relevance to the musicological analysis at issue here.

81.    It is common for songs that use the basic building block of a pentatonic scale, like LGO and TOL, to avoid scale-step 7. (Id.).

**Response:** Disputed that either TOL or LGO are purely major pentatonic scale compositions.  Revised Covach Report (ECF 200-7) ¶ 15.

82.    TOL and LGO express their melodic phrases in different ways. (Ricigliano Report at 35-36).

**Response:** Disputed, as the idea of how two songs "express their melodic phrases," and whether they are "different," is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

C. Dr. Everett's Fifth Summary Bullet

83.    Dr. Everett claims that both songs end melodic phrases on the same note – a "non-resolving" scale degree 1. (Revised Everett Report at 17).

**Response:** Disputed, and disputed that this has relevance to the musicological analysis at issue here.  Defendants and their experts are misreading or misinterpreting Dr. Everett.  As he explains on page 8 (¶ B.4.d.), "Perhaps most tellingly, both melodies end with an ornamented ^1 in the vocal despite the fact that all phrases end on V (which is normally most characteristic in withholding ^1), making for the same tension-filled, non-resolving non-chord tones in the phrases' climaxes."  A review of the notation clearly shows that ^1 (E-flat) is the last primary note of the melody.  Indeed, in the excerpt from the sheet music Dr. Everett annotates "final ^1 is ornamented here with upper neighbor ^2."  Revised Everett Report (ECF 200-11) ¶¶ B.4-5.

84.    However, as objectively demonstrated in the Ferrara II Report, the phrases do not, in fact, both end on scale degree 1. (Ferrara Report II ¶¶ 59-63; see also Ricigliano Report at 32-33).

**Response:** Disputed, and disputed that this has relevance to the musicological analysis at issue here.  Please see Plaintiff's response to paragraph 83, which is incorporated in full into this response.

85.     Moreover, the notes and rhythmic values of these melodies are different. (Ferrara II Report ¶¶ 26-47; Ricigliano Report at 22-28).

**Response:** Undisputed that the notes and rhythmic values are not identical.  Otherwise disputed, as the idea of whether and how they are "different" is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

86.     Countless songs that are totally different end on the same note. (Ricigliano Report at 33).

**Response:** Undisputed.

87.     Ending phrases in this manner is a common melodic technique, which Sheeran has employed in his earlier works. (Id.).

**Response:** Paragraph 87 is vague as to what "in this manner" refers to, and is therefore disputed.  Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim.*

D. Dr. Everett's Eighth Summary Bullet

88.     Dr. Everett opines that both songs begin in a "weak metrical location." (Revised Everett Report at 17).

**Response:** Undisputed

89.     However, Dr. Everett obscures that both songs begin on different beats. (Ferrara II Report II ¶¶ 79-83).

**Response:** Disputed.  Dr. Everett obscures nothing, and Dr. Ferrara does not so claim. Revised Everett Report (ECF 200-11), *passim*; Ferrara II Report ¶¶ 79-83.

90.     Moreover, it is commonplace for vocal melodies to begin in weak metrical positions. (Id.; Ricigliano Report at 34).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

91.     Countless songs begin after a rest on a weak metrical position. (Id.).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Covach Report (ECF 179-1), *passim*; Covach Rebuttal (ECF 179-7), *passim*; Everett Report (ECF 179-5), *passim*.

E. Dr. Everett's Ninth Summary Bullet

92.     Dr. Everett notes that both songs make use of "melisma." (Revised Everett Report at 15-17).

**Response:** Undisputed.

93.     Melisma (an unprotectable commonplace technique) is a vocal technique that occurs when a vocalist sings a single lyrical syllable over multiple notes (as opposed to one note per syllable). (Ricigliano Report at 34).

34

**Response:** Undisputed.

94.    Melisma has been used for centuries and is commonplace in popular music. (Ferrara Report II ¶¶ 85, 90).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

95.    Sheeran frequently used melisma in his prior songs. (Ricigliano Report at 34-35).

**Response:** Undisputed.  Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

96.    The two songs use the technique of melisma in significantly different ways, in different segments of the songs and in connection with different lyrics. (Ferrara II Report ¶¶ 88, 90).

**Response:** Undisputed that the two songs do not have identical segments or identical lyrics, which means – tautologically – that they cannot be said to use melisma in connection with their segments and lyrics in the exact same way.  Otherwise disputed, as the concept of "significantly different" use of melisma is either a subjective musicological determination or a subjective legal determination, neither of which is subject to resolution under Fed. R. Civ. P. 56.

97.     As detailed in the Memorandum of Law submitted in support of the Original
Summary Judgment Motion, melisma is so commonplace a technique that case law confirms it is
not protectable or copyrightable.  (ECF 181 at 11-12).

**Response:** Disputed, as the paragraph expresses a legal position, not a purported
undisputed fact.

<u>Song Structures</u>

98.     LGO and TOL both incorporate generic structural building blocks of music
through the use of verse and chorus sections; yet, beyond the general commonplace musical
building blocks of structure used by millions of songs, TOL and LGO are not structurally
similar. (Ferrara I Report ¶¶ 26-28; Ricigliano Report at 11).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.
Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

99.     TOL includes two pre-chorus sections; LGO has none. (Ferrara I Report ¶ 27).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

100.     LGO includes two bridge sections; TOL has none. (Id.).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

101.     TOL includes an interlude; LGO has none. (Id.).

**Response:** Disputed.  Differences in interpretation in popular music song form are
common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

102.     Even as charted by Dr. Covach, structural differences exist between the two songs.  (Id. ¶¶ 124-26).

**Response:** Disputed.  Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF 200-7)*, passim*.

103.     Looping (i.e., repeating) a chord progression both generally, and in more than one section of a composition, is common in popular music. (Ferrara II Report ¶ 20; Ricigliano Report at 17-19, 35).

**Response:** Undisputed that the technique, standing alone, is unprotectible.  The combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

104.     Sheeran's prior works frequently utilize looping. (Ricigliano Report at 17-19, 35).

**Response:** Undisputed, but Sheeran's and/or Wadge's use of one or more elements found in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara nor Ricigliano claim (and neither Covach nor Everett conceded) that any prior Sheeran or Wadge composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report, *passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

105.     TOL does not use the same chord progression throughout its choruses. (Ferrara II Report ¶¶ 20-21, 24-25; Ricigliano Report at 17).

**Response:** Disputed.  Please see Plaintiff's responses to paragraphs 33 and 41, which are incorporated in full into this response.

106.     The duration of the "looped" chord progressions is different in each work. (Ferrara II Report ¶¶ 20-21, 24-25).

**Response:** Disputed. Please see Plaintiff's response to paragraph 41, which is incorporated in full into this response.

107.    The final two measures of the TOL choruses use a different chord progression that "breaks away" from the basic I-I6-IV-V progression. (Id.).

**Response:** Undisputed, but disputed that these differences have relevance to the musicological analysis at issue here.

108.    Dr. Everett's conclusion – that both songs "share the same formal structure at sub-phrase, phrase, section, and multi-section levels" – is demonstrably incorrect. (Id. ¶¶ 66-72).

**Response:** Disputed. Differences in interpretation in popular music song form are common among scholars who work in this field. Revised Covach Report (ECF 200-7), *passim*.

<u>The Alleged "Combination" Or "Backing Pattern"</u>

109.    Beyond the foregoing factually baseless attempt to fabricate alleged melodic and structural similarities that do not exist, which are commonplace musical techniques, including techniques which were previously employed by both Sheeran and Wadge in their prior songs and are a part of both Sheeran's and Wadge's musical toolkits, SAS's infringement claim is based essentially exclusively on what Dr. Covach alleges is a "backing pattern" that he claims exists in each song. (Revised Covach Report ¶¶ 3, 17-22).

**Response:** Undisputed that the commonalities between LGO and TOL is reflected in the "backing pattern," which forms a part of Dr. Covach's conclusion that the two songs are similar. Disputed as to the remainder of the characterizations in this paragraph, which are nothing more than attorney hyperbole and argument. Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*.

110.    This alleged "backing pattern," as identified by Dr. Covach, is comprised of a "coordination of harmony (chord progression) and rhythm." (Revised Covach Report ¶ 3).

**Response:** Undisputed.

111.    Dr. Covach's Original Report specifically required that the combination include all three elements (including a bass line) and opined that it was the "precise combination" of these three required elements that gave rise to his opinion of copying; without all three elements, Dr. Covach admitted that his conclusion of copying has no foundation.  (Covach Report ¶¶ 3, 17-22).

**Response:** Disputed.  In his Original Report, Dr. Covach identified three elements in the "backing pattern," but never stated that all three elements are required for a finding of similarity. Original Covach Report (ECF 179-1), *passim*; Original Covach Rebuttal (ECF 179-7), *passim*. As discussed in the accompanying Memorandum of Law, this Court has concluded – in its decision in the *Griffin* matter that is binding on Defendants – that the disputed material questions of fact concerning purported commonality of <u>two</u> elements requires that the Court deny Defendants' motion for summary judgment of infringement.  *Griffin* ECF 93 (Jan. 3, 2019) at 2, 10-13, 18.  Also as discussed in the accompanying Memorandum of Law, Defendants' cases in purported support of the argument that two elements cannot, as a matter of law, support a selection and arrangement argument, provide no such support.

112.    [Intentionally omitted as resolved by the Court's Daubert Order].

**Response:** [This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.]

113.    [Intentionally omitted as resolved by the Court's Daubert Order].

**Response:** [This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.]

Supplemental Statement No. 10. As noted, in its Daubert Order, the Court reaffirmed its prior ruling that the Deposit Copy does not notate a bass-line, and that a bass-line is not part of LGO's copyright. (ECF 197).

**Response:** Undisputed.  This issue has been rendered moot by the Original MIL Opinion, but SAS reserves its rights with respect to the "deposit copy" issue.

Supplemental Statement No. 11. Despite the Original Covach Report requiring the combination of all three elements, the Revised Covach Report proceeds as if the Court's elimination of the third element (the bass line) that the Original Covach Report previously required, is of no consequence and that now it is the "precise combination" of only two elements, both of which this Court has already held are commonplace and unprotectible, that give rise to his opinion of copying. (Revised Covach Report ¶¶ 3, 17-22).

**Response:** Disputed.  The quoted language is incomplete and taken out of context. Please see Plaintiff's response to paragraph 111, which is incorporated in full into this response.

114.     As detailed above, Dr. Covach admits that LGO's I-iii-IV-V chord progression and its rhythmic anticipation of chord changes are both commonplace musical elements. (Supra ¶¶ 36, 42).

**Response:** Undisputed that each element, standing alone, is unprotectible.  The use of the combination of elements in LGO and TOL, however, is similar and distinctive.  Revised Covach Report (ECF 200-7), *passim*; Revised Covach Rebuttal (ECF 200-9), *passim*; Revised Everett Report (ECF 200-11), *passim*.

115.    Indeed, even without having performed any prior art search – itself a flaw that warrants exclusion of Dr. Covach's Reports – Dr. Covach previously admitted that there may be songs prior to LGO that employ both of these elements. (Original Covach Report ¶ 22).

**Response:** Disputed that Dr. Covach was required to conduct a prior art search.  Original Everett Report (ECF 179-5), *passim*.  Disputed that "Dr. Covach previously admitted that there may be songs prior to LGO that employ both of these elements."  What he actually wrote was "perhaps even two of them together."  Original Covach Report (ECF 179-1) ¶ 22.

116.    In fact, multiple works exist that use a I-iii-IV-V chord progression (or a I-I6-IV-V chord progression) together with anticipation of chord changes on the second and fourth chords. (Ferrara I Report ¶¶ 56-65, 107; see also Revised Covach Report ¶¶ 11-13; Ferrara Rebuttal ¶¶ 30-38).

**Response:** Disputed.  Dr. Everett explains that based on his study, the sixth most popular chord progression beginning with I is the progression at issue here: "I - iii - IV - V (or its bass-line equivalent, I - I6 - IV - V)."  He goes on to explain: "the progression class shared between our exhibits by Marvin Gaye - Edward Townsend and Ed Sheeran, I - iii - IV - V, is uncommon, with far fewer examples than any of those progressions listed above it."  Revised Everett Report (ECF 200-11) ¶¶ A.6-7.

Dr. Everett identifies 12 songs released <u>before</u> LGO with the same "combined upper voice and chord progression" as LGO and TOL, but then makes the point that LGO and TOL depart in a critical way:

> Because neither the Gaye - Townsend composition nor Sheeran in his performance are interested in the upper-voice ^7, the melodies in the Gaye - Townsend deposit copy and the Sheeran recording are marked as deviant from the most common vocalization against iii in this specific progression, further supporting the connection of class members I - iii - IV - V and I - I6 - IV - V in these exhibits.

Revised Everett Report (ECF 200-11) ¶ B.7.

Dr. Everett also takes note of common but unusual features of TOL and LGO, identifying

only one other song that is potentially similar:

> It is very unusual to repeat the I - iii - IV - V progression as a loop without
> contrast, and beyond rare to do so throughout the entirety of both verses and
> choruses; the Commodores' "Easy" is the only such example known to me other
> than our Gaye - Townsend and Sheeran exhibits.

Revised Everett Report (ECF 200-11) ¶ C.3.

On the topic of harmonic rhythm or syncopation, Dr. Everett once again opines that

"Syncopated chord changes, occurring on weak beats, are much less common, but these are

heard in both Gaye - Townsend and Sheeran exhibits.  Revised Everett Report (ECF 200-11) ¶

D.1.

Dr. Everett summarizes his overall analysis of the two works as follows:

> In summary, comparison of the Gaye - Townsend deposit copy with the Sheeran
> recording yields a number of correspondences: both songs share the same
> repeated four-chord progression. Both feature melodies based on the same
> distinctive structural shape, including similar relations between vocal tones and
> underlying chords, and both display the same rhythmic freedom. Both songs share
> the same formal structures at all levels, from surface phrases to largest sections.
> Both are among the only three known songs to share the same syncopation of the
> repeated four-chord pattern. The sharing of all of these elements strongly
> evidence copying by Sheeran of Gaye - Townsend.

Revised Everett Report (ECF 200-11) ¶ E.4.

Dr. Ferrara argues in response that there are many songs that use the I – iii – IV – V

chord progression (about which there is no real debate), and claims that he found three pre-1973

songs that have the same combination of elements identified by Dr. Covach.  Dr. Covach meets

Dr. Ferrara with respect to all three songs, explaining why – in his expert opinion – they do not

share the combination of elements and are not "prior art" to LGO.  Regarding "Downtown" he

says that Dr. Ferrara – who did not provide musical transcription to back up his claim – is simply incorrect:

> As indicated by the example, the chord progression moves from I to IV and then to V, with all three harmonies occurring over a repeated D note in the bass (a centuries-old technique called "pedal point"), indicated by the label "tonic pedal" in Example 1. As least as far as concerns the published sheet music, <u>the backing pattern as I have defined it is not present</u>.

Revised Covach Rebuttal (ECF 200-9) ¶ 10 (emphasis added).

As for "Since I Lost My Baby," Dr. Covach points out that Dr. Ferrara chose an obscure version of the song recorded by Ray French, as opposed to the mainstream version recorded by the Temptations that reached Number 17 on the U.S. pop music charts, which – based on the sheet music – does not use the same combination of elements:

> Example 2 provides the opening measures to the verse section as it appears in the published sheet music for "Since I Lost My Baby." Note that while the harmonic rhythm from the backing pattern is present in "Since I Lost My Baby," the final chord differs: instead of the V chord that is part of the LGO and TOL patterns, a I chord is used here with a C in the bass (traditionally referred to as a "I64 chord").

Revised Covach Rebuttal (ECF 200-9) ¶ 11.

Dr. Covach identifies the same problem with Dr. Ferrara's use of "Georgy Girl" – Dr. Ferrara points an obscure "easy listening" orchestral version of the song, rather than the global hit version recorded by The Seekers.  When compared to the mainstream version, Dr. Covach explains, the combination of elements is not there:

> Note that while the four-chord progression is the same as the one in LGO, the harmonic rhythm does not match the one found in LGO, since the chords all change directly on the beats one and three, and thus lacking the element of syncopation or "anticipation," as Dr. Ferrara labels it.

Revised Covach Rebuttal (ECF 200-9) ¶ 13.

117.    As noted above, TOL co-author Amy Wadge co-authored a song prior to co-authoring TOL that includes a I-I6-IV-V chord progression that anticipates chord changes on the

second, third and fourth chords (i.e., the only difference between TOL and this prior work by

Amy Wadge is that the prior work also happens to anticipate the third chord change). (Supra ¶

53).

    **Response:** Undisputed, but Sheeran's and/or Wadge's use of one or more elements found

in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara

nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge

composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report,

*passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

    118.    As noted above, prior to releasing the album x (which includes TOL), Sheeran

used anticipation in at least twenty songs that he wrote or co-wrote, and in ten of those twenty

songs, anticipation occurs on the second and fourth chords of a chord progression (as in TOL and

LGO). (Supra ¶ 52).

    **Response:** Undisputed, but Sheeran's and/or Wadge's use of one or more elements found

in TOL prior to creating TOL has no bearing on whether TOL infringes LGO.  Neither Ferrara

nor Ricigliano claim (and neither Covach nor Everett concede) that any prior Sheeran or Wadge

composition includes what Dr. Covach refers to as the "backing pattern."  Ferrara I Report,

*passim*; Ferrara II Report, *passim*; Ferrara Rebuttal Report, *passim*; Ricigliano Report, *passim*.

    119.    TOL does not use the two commonplace and unprotectible elements in an

identical or virtually identical manner to LGO, as even Dr. Covach has admitted through his

"functional equivalence" assertion and as shown above in Paragraphs 41-51. (Revised Covach

Report ¶ 7 Ferrara Rebuttal Report ¶ 26; supra ¶¶ 41-51).

    **Response:** Disputed.  Please see Plaintiff's responses to paragraphs 22, 33, 41 and 116,

which are incorporated in full into this response.

### V.    Indirect Touring And Merchandising Profits

120.    SAS has no evidence showing that Sheeran's touring and merchandising profits have any causal nexus to the alleged infringement. (Original Zakarin Decl. ¶¶ 116-120).

**Response:** As discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were <u>separate acts of infringement</u>, giving rise to <u>direct profits</u>, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.

121.    SAS did not serve requests for production that bear upon whether a causal nexus exists between Sheeran's touring and merchandising profits and TOL's alleged infringement of LGO. (Id. at Exhibit 18).

**Response:** Undisputed, but as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were <u>separate acts of infringement</u>, giving rise to <u>direct profits</u>, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.

122.    Defendants served requests for production on SAS seeking documents and other tangible items that support SAS's claim of a causal nexus between Sheeran's touring and merchandising profits and TOL's alleged infringement of LGO. (Id. at Exhibit 19, Request Nos. 33, 35, 36, 44, 61, 86).

**Response:** Undisputed, but as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were <u>separate acts of infringement</u>, giving rise to <u>direct profits</u>, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.

123.    SAS has not produced any documents or tangible items responsive to the above-mentioned requests. (Original Zakarin Decl. ¶ 119).

**Response:** Undisputed, but, as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were <u>separate acts of infringement</u>, giving rise to <u>direct profits</u>, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.  Moreover, SAS would not have access to any such documents, which – if they exist – would be in the exclusive possession of Defendants.

124.    Instead, SAS produced a total of 403 pages of documents, which fall under the following seven categories: (1) documents from and correspondence with ASCAP, BMI, SoundExchange and The Harry Fox Agency concerning public performance income, interactive streaming income and mechanical royalties; (2) hearsay articles from print publications and the Internet; (3) probate records for the Estate of Ed Townsend; (4) sheet music; (5) excerpts from a book on Marvin Gaye's "Greatest Hits"; (6) email correspondence between SAS's principal and others regarding this matter and other music infringement cases; and (7) royalty statements for LGO. (Id.).

**Response:** Undisputed but, as discussed in the accompanying Memorandum of Law, Defendants are laboring under an incorrect legal premise, as this Court has already ruled that Mr. Sheeran's performances of TOL – if TOL infringes LGO – were <u>separate acts of infringement</u>, giving rise to <u>direct profits</u>, for which no showing of nexus is required, or if required has already been satisfied and/or is "obvious," shifting the burden to Defendants to prove a proper apportionment of their profits.  Moreover, SAS would not have access to any such documents, which – if they exist – would be in the exclusive possession of Defendants.

### Plaintiff's Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Summary Judgment

125.    On May 31, 2020, Plaintiff served the Expert Report on Damages and Profits, authored by Gary Cohen, CPA ("Cohen Report"), on Defendants.  Parness Cert. ¶ 3 & Ex. 1.

126.    On July 7, 2020, Defendants served the Amended Expert Report of Barry M. Massarsky ("Massarsky Report"), on Plaintiff.  Parness Cert. ¶ 4 & Ex. 2

127.    According to Plaintiff, a proper apportionment of the profits arising from Mr. Sheeran's 94 concert performances of TOL on or after June 28, 2015 ranged from 13.13% (based on Chartmasters Spotify data) to 23.97% (using Recording Industry Association of America certified sales data).  Cohen Report (Parness Cert. Ex. 1) at 9-10.

128.    Defendants admit that if TOL infringes LGO, sales of multi-track albums containing single recordings of TOL are separate acts of infringement.  Massarsky Report (Parness Cert. Ex. 2) at 4-5.

129.    Defendants admit that if TOL infringes LGO, profits arising from sales of record albums containing recordings of TOL are direct profits.  Massarsky Report (Parness Cert. Ex. 2) at 4-5.

130.     Defendants admit that if TOL infringes LGO, there is a causal nexus between the infringing TOL, and the profits arising from sales of record albums containing recordings of TOL.  Massarsky Report (Parness Cert. Ex. 2) at 4-5.

131.     Defendants argue that if TOL infringes LGO, the profits arising from sales of record albums containing recordings of TOL should be apportioned on a "straight-line" basis, by which they mean total profits divided by the number of tracks on the album.  Massarsky Report (Parness Cert. Ex. 2) at 4-5.

132.     Defendants argue that if TOL infringes LGO, the profits arising from live performances of TOL should be apportioned on a "straight-line" basis, by which they mean total profits divided by the number of songs performed.  Massarsky Report (Parness Cert. Ex. 2) at 21.

Dated:  New York, New York
       December 14, 2021

                                        PARNESS LAW FIRM, PLLC

                                        By:_____/s/ Hillel I. Parness_____
                                        Hillel I. Parness
                                        136 Madison Ave., 6th Floor
                                        New York, New York  10016
                                        (212) 447-5299
                                        hip@hiplaw.com
                                        *Attorneys for Plaintiff*
                                          *Structured Asset Sales, LLC*